COMMONWEALTH *vs.* CORY SELBY.

Suffolk. January 9, 1995. - June 26, 1995.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, & GREANEY, JJ.

*Evidence*, Admissions and confessions. *Constitutional Law*, Admissions and confessions, Waiver of constitutional rights. *Waiver. Practice, Criminal*, Voluntariness of statement.

The record at a criminal trial of a hearing on a motion to suppress the defendant's statements to police supported the judge's findings of fact and conclusion that the defendant's statements were made voluntarily and after a valid Miranda waiver; the defendant did not demonstrate that he had invoked his right to remain silent during the interrogation. [660-662]

In the totality of the circumstances surrounding a police interrogation of a defendant arrested for murder, police officers' use of false information to elicit incriminating statements from the defendant did not cause the defendant's subsequent statements to be involuntary. [662-665]

INDICTMENTS found and returned in the Superior Court Department on September 18, 1992.

A pretrial motion to suppress evidence was heard by *Robert A. Mulligan*, J.

An application for leave to prosecute an interlocutory appeal was allowed by *Greaney*, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him.

*Stephen Hrones* (*Judith C. Knight* with him) for the defendant.

*John P. Zanini*, Assistant District Attorney, for the Commonwealth.

LIACOS, C.J. On September 16, 1992, indictments were returned against Mark Edwards, Paul Gunter, and the defendant, Cory Selby, charging each with murder in the first degree, unlawful possession of a firearm, and entering a

dwelling while armed with the intent to commit a felony. Selby and his codefendants individually filed pretrial motions to suppress custodial statements made to the police. The motions were denied. Each defendant was granted leave to pursue an interlocutory appeal by a single justice of this court. Because the appeals present substantially identical issues, the defendant Selby's case was consolidated with the case of Edwards and Gunter. Our decision regarding the appeal of codefendants Edwards and Gunter is reported separately. *Commonwealth* v. *Edwards, post* 666 (1995).

The motion judge who heard defendant Selby's motion to suppress found the following facts with regard to the postarrest interrogation of the defendant. We accept these findings of fact in the absence of clear error and we view with respect the conclusions of law based on them. See *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 538 (1990); *Commonwealth* v. *Tavares*, 385 Mass. 140, 144-145, cert. denied, 457 U.S. 1137 (1982). However, the judge's ultimate findings and conclusions of law, especially those of constitutional dimensions, are open to independent review on appeal. See *Commonwealth* v. *Colon-Cruz, supra* at 538-539; *Commonwealth* v. *Watkins*, 375 Mass. 472, 476 (1978).

While investigating the murder of one Jack Berry, Jr., Boston police Lieutenant Detective Timothy Murray and other members of the homicide unit received information that, on the day of the murder, the defendant Selby, Mark Edwards, and a woman named Larricia McConnico had been at the victim's residence in the Dorchester section of Boston prior to the shooting of the victim. The defendant was arrested and booked on charges of murder and armed assault in a dwelling. He was advised of his Miranda rights and his right to make a telephone call. The defendant stated that he understood his rights, signed the booking sheet acknowledging the Miranda warnings, and made a phone call. *Miranda* v. *Arizona*, 384 U.S. 436 (1966). The defendant was then taken to the homicide division in South Boston.

At the homicide division the defendant was interrogated by Detectives Dennis Harris and Murray. Harris read the

defendant his Miranda rights, and the defendant said he understood each of the rights, initialed and signed the Miranda form, and indicated that he was willing to speak with the detectives.

The defendant stated that on the day of the murder he received a phone call from Mark Edwards during which Edwards told the defendant that he had been robbed. Edwards asked the defendant to accompany him to Dorchester with Paul Gunter and McConnico. The defendant stated that, when they arrived at the victim's residence, Gunter stayed in the car and the defendant, Edwards, and McConnico approached the house. He stated that Edwards went inside but that he and McConnico stayed on the front porch. When they heard some noises, he and McConnico ran toward the car and were joined there by Edwards. The group then drove away. The defendant stated that he had in his possession a .380 caliber handgun and that Edwards was carrying a nine millimeter handgun.

When the defendant completed his statement, Murray opened a file and removed from it a photocopy of a handprint. Murray asked the defendant how the police could have found his print in the hallway of the victim's house if he had not entered the residence. The handprint was not the defendant's and was not found in the house. It was apparently unconnected to the murder. The defendant then altered his story, stating that he had been in the "outer hallway" of the house. He said that he, Edwards, and McConnico had entered the house with guns drawn and that while inside there was an argument. The defendant said that, on hearing shots fired, he and McConnico left the house.

Murray then asked the defendant if he was willing to record his statement on tape and the defendant stated that he was. On tape, the defendant was readvised of his Miranda rights. He stated again that he understood each one of the rights. The defendant also acknowledged that the rights had been read to him earlier. The defendant then recounted, in response to Murray's questions, his version of what had occurred on the day in question. During this interview, Murray

asked the defendant if there were "any reasons why we found your fingerprints on the shell casings inside the house?" In fact, the police had not found any such fingerprints. The defendant stated that he had been playing with the gun earlier and had loaded it but he had not been armed with the nine millimeter handgun the night of the shooting. Later in the interview, Harris asked the defendant why an independent witness would have given a description of the shooter which matched the defendant's physical appearance. The defendant stated that he did not know why a witness would have given such a description.

Following the taping of the statement, the defendant used the bathroom. When he returned he asked the detectives if he could "tear up" the tape recording and make a new statement. The defendant stated that there was a technicality he wanted to clear up and that he wanted to tell what really happened.

The tape recorder was reactivated and the defendant was again advised of his Miranda rights. The defendant then stated that on the day in question he went to the house of the victim armed with a nine millimeter handgun to retrieve money and drugs, and that Edwards was with him, also armed with a nine millimeter handgun. He stated that when they entered the apartment, all of its occupants were in the kitchen and that as he was leaving one of the occupants, a man (Berry), grabbed his hand and the gun went off, firing two or three shots. The defendant stated that he later learned that the man had died of a gunshot wound to the chest.

The judge found that throughout the interrogation the defendant was "sober, alert, oriented and lucid. He understood his rights and the questions asked. He was responsive to the questions and at times, gave answers in a narrative form." The judge also found that, although Murray and Harris did not actually possess an incriminating handprint or fingerprints, they had received a statement or statements from a witness that the defendant was in the apartment and that he had shot the victim. They also knew that the shells recovered were nine millimeter in caliber.

Based on these facts, and after a careful review of the relevant law, the judge concluded that the statements were admissible because they were made voluntarily and also followed a knowing, intelligent, and voluntary waiver of Miranda rights. The record supports the judge's findings of fact and we affirm his conclusion that the defendant's statements were made voluntarily and after a valid Miranda waiver. See *Commonwealth* v. *Quigley*, 391 Mass. 461, 463-64 (1984), cert. denied, 471 U.S. 1115 (1985). Accordingly, we affirm the denial of the defendant's motion to suppress.

The defendant does not argue that the police failed to administer accurate and complete Miranda warnings. Nor does he argue that his initial waiver of these rights on his arrival at the homicide division was invalid. Rather, he argues that he invoked his right to remain silent after making the first taped statement when Harris asked him whether he had "anything further to add" and the defendant answered, "no." He claims that his right to remain silent was not scrupulously honored by the officers, because the interrogation continued and, although the officers read him his Miranda rights again prior to the second taped statement, any potential waiver was tainted by the false information used by the detectives earlier in the interrogation. The defendant also argues that the intentional use of false information by the interrogating officers, i.e., the palm print and the fingerprints, to elicit incriminating responses from him, rendered his subsequent statements involuntary as a matter of both due process and in violation of the Miranda precepts. We disagree with both of the defendant's claims.

1. *Invocation of right to silence.* The defendant's first argument can be disposed of without lengthy discussion. A valid Miranda waiver is one that is made knowingly, intelligently, and in all respects, voluntarily. *Miranda* v. *Arizona*, 384 U.S. 436, 467 (1966). Moreover, we agree that if, at any time, a suspect subject to custodial interrogation indicates that he wants the interrogation to cease, i.e., he invokes his right to remain silent, that request must be scrupulously honored by the police. *Commonwealth* v. *Taylor*, 374 Mass.

426, 431-432 (1978). See *Michigan* v. *Mosley*, 423 U.S. 96 (1975).

The record supports the judge's conclusion, and the defendant does not dispute it, that the defendant made a valid waiver of his Miranda rights prior to the start of the interrogation by Harris and Murray. However, the defendant argues that he invoked his right to remain silent when, at the conclusion of the first taped statement, Harris asked him if he had anything to add and the defendant replied that he did not. Specifically, the record indicates that the detective asked the defendant, "Is there anything else you'd like to add before we shut off?" to which the defendant responded, "no."

The defendant's response to the detective's question did not amount to an exercise of his right to remain silent. See *Commonwealth* v. *Messere*, 14 Mass. App. Ct. 1, 7-8 (1982) (defendant did not exercise right to silence by answering "no" when asked if he had anything to add to statement). The detective's question was merely in reference to the completion of the taped statement and was wholly innocuous. The exchange is the equivalent of the detective stating, "I'm going to shut off the tape recorder now, OK?" and the defendant responding, "all right." The defendant's negative response appears to have been merely an indication that he had finished his statement and the machine could be shut off rather than an invocation of his right to remain silent. Compare *Commonwealth* v. *Roberts*, 407 Mass. 731 (1990) (defendant's refusal to answer certain questions was not an assertion of right to remain silent); *Commonwealth* v. *Hussey*, 410 Mass. 664, cert. denied, 502 U.S. 988 (1991) (defendant's statement that he "had nothing else to say" and his thinking out loud as to whether he should talk or not did not amount to invocation of right to remain silent); *Commonwealth* v. *Pennellatore*, 392 Mass. 382 (1984) (where defendant was willing to talk both before and after break in questioning, his request "Can we stop please?" did not amount to an assertion of his right to remain silent), with *Commonwealth* v. *Brant*, 380 Mass. 876, cert. denied, 449 U.S. 1004 (1980) (defendant invoked right to remain silent

when he responded "no" to the officer's question whether he was willing to proceed without an attorney present); *Commonwealth* v. *Jackson*, 377 Mass. 319 (1979) (defendant invoked right to silence when he responded to reading of Miranda warnings by saying that he "didn't have anything to say"); *Commonwealth* v. *Taylor, supra* (defendant exercised right to silence when he stated that on advice of counsel he did not wish to say anything).

"If a defendant who has initially waived his right to remain silent wishes later to cut off questioning, he must 'indicat[e] in [some] manner' that he is invoking the right he previously waived." *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 265 (1982), quoting *Miranda* v. *Arizona*, 384 U.S. 436, 473-474 (1966). "For the rule of Miranda regarding the termination of questioning to apply, there must be either an *expressed* unwillingness to continue or an affirmative request for an attorney (emphasis supplied)." *Commonwealth* v. *Roberts, supra* at 734, quoting *Commonwealth* v. *Pennellatore, supra* at 387. The defendant did not express an unwillingness to speak in the instant case which can be considered tantamount to the exercise of the right to remain silent.

2. *Voluntariness of statements.* The defendant also argues that the intentional use of false information by the detectives, in an effort to elicit incriminating statements from the defendant, rendered any statements made subsequent to the utilization of the false information involuntary under the due process clause of the Fourteenth Amendment to the United States Constitution.[1]

A statement is voluntary if it is the product of a "rational intellect" and a "free will." *Commonwealth* v. *Davis*, 403 Mass. 575, 581 (1988). In determining whether a statement

---

[1]The defendant also argues, as did codefendant Edwards, that the use of the false handprint rendered his Miranda waiver involuntary. For essentially the reasons stated in *Commonwealth* v. *Edwards, post* 666 (1995), and because all other relevant factors specific to the instant case indicate a voluntary waiver was made, we disagree and affirm the judge's conclusion that the defendant made a valid waiver of his Fifth Amendment rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966).

was made voluntarily, in compliance with due process of law, we examine whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act. See *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 539 (1990); *Commonwealth* v. *Parker*, 402 Mass. 333, 340 (1988); *Delle Chiaie* v. *Commonwealth*, 367 Mass. 527, 533 (1975). See also *Commonwealth* v. *Mahnke*, 368 Mass. 662, 680 (1975), cert. denied, 425 U.S. 959 (1976). Under this "totality of the circumstances" test, we consider all of the relevant circumstances surrounding the interrogation and the individual characteristics and conduct of the defendant. *Commonwealth* v. *Parker*, *supra* at 340. Relevant factors include, but are not limited to, "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings." *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986). See *Withrow* v. *Wilson*, 507 U.S. 680 (1993); *Commonwealth* v. *Meehan*, 377 Mass. 552, 563 (1979), cert. dismissed, 445 U.S. 39 (1980); *Commonwealth* v. *Mahnke*, *supra* at 699, for examples of other factors considered. See also K. B. Smith, Criminal Practice and Procedure §§ 372-382 (2d ed. 1983).

Once a defendant has presented evidence that the statements at issue were made involuntarily, the burden is on the Commonwealth to prove beyond a reasonable doubt that the statements were made voluntarily. See *Commonwealth* v. *Tavares*, *supra* at 151-152; *Commonwealth* v. *Mandile*, *supra* at 413; K. B. Smith, Criminal Practice and Procedure § 370 (2d ed. 1983).

The defendant argues that the detectives' use of nonexistent incriminatory information as a "ruse" to elicit incriminating statements amounted to psychological coercion by the detectives, thus rendering any subsequent statements invol-

untary. The use of false information by police during an interrogation is deceptive and is a relevant factor indicating a possibility that the defendant's statements were made involuntarily. However, "[t]aken alone, the misinformation [does] not, we think, suffice to show 'involuntariness' " in the instant case. *Commonwealth* v. *Meehan, supra* at 563 (statements held involuntary where defendant was young, poorly educated, intoxicated, was assured confession would aid defense, was told police had strong case against him, and was not informed of his right to make a telephone call). See *Oregon* v. *Mathiason*, 429 U.S. 492, 495-496 (1977); *Frazier* v. *Cupp*, 394 U.S. 731, 738-739 (1969); *Miranda* v. *Arizona, supra.* Cf. *Moran* v. *Burbine*, 475 U.S. 412, 421 (1986) ("[o]f the numerous varieties of police trickery . . . a lie that relates to a suspect's connection to a crime is the least likely to render a confession involuntary"). See also *Commonwealth* v. *Forde*, 392 Mass. 453, 455 (1984) ("The fact that the statement was educed by trickery was 'relevant but not conclusive' " to a determination of whether Miranda rights were voluntarily waived).

The presence of one or more factors suggesting a statement may have been made involuntarily is not always sufficient to render the statements involuntary. See, e.g., *Commonwealth* v. *Fernette*, 398 Mass. 658 (1986) (fact that defendant was hungry and tired during interrogation did not render statements involuntary); *Commonwealth* v. *Look*, 379 Mass. 893, cert. denied, 449 U.S. 827 (1980) (upset emotional state did not render statements involuntary). We conclude that, in the totality of the circumstances surrounding the making of the statements at issue, the use of the false information did not cause subsequent statements to be uttered involuntarily. The defendant does not argue that he was in any way incapacitated or incompetent. In fact the motion judge found that he was "sober, alert, oriented and lucid" during the interrogation. The defendant was read his complete Miranda rights and waived them prior to any questioning. Moreover, the detectives read the defendant his Miranda rights three times more over the course of the interro-

gation. There is no evidence supporting the defendant's assertion of involuntariness beyond the use of the false handprint and the fingerprints. While such deception is not approved of by this court, see *Commonwealth* v. *Jackson*, 377 Mass. 319, 328 n.8 (1979), we do not think that its occurrence in the instant case resulted in the defendant making involuntary statements.

We affirm the denial of the motion to suppress.

*So ordered.*

·Justice Nolan participated in the deliberation on this case, but retired before the opinion was issued.