Neel, J.
Defendant Richard Guppy (“Guppy”) is charged in twenty-nine indictments with breaking and entering, larceny, malicious destruction of property, possession of burglarious tools and drug paraphernalia, carrying a firearm without a license, and larceny of a firearm. He moves to suppress any incriminating statements he made to police officers between September 16-19, 1994, and any evidence derived from such statements, on the basis that he did not knowingly, intelligently, and voluntarily waive his right to remain silent and his right against self-incrimination. He alleges that at the time he made the statements he was experiencing heroin withdrawal, and therefore that the statements were taken in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and Articles Twelve and Fourteen of the Massachusetts Declaration of Rights.
At a hearing on the motion, the Commonwealth presented testimony by Quincy Police Detective John Haines and Sergeant Peter Turowski, Weymouth Police Detective Elliot Gabriel and Sergeant Maiy Ellen Scannell, Randolph Detective John Hamelburg, and Braintree Detective James MacDonald. Defendant testified, and presented testimony by James O’Brien, M.D. (a physician and pharmacologist) Lorraine Alebord, John P. Cloherty, Quincy Police Detective Ralph Ames and Sergeant Angus McEachern, Ed Polmgren, and Quincy Police Officer Peter Clancy and Lieutenant Anthony DiBona. For the reasons set forth below, the motion is allowed in part and denied in part.
FINDINGS OF FACT
On the basis of the credible evidence presented, and inferences reasonably drawn therefrom, I find as follows.
On Friday, September 16, 1994, between 7:30 and 8:00 p.m., Quincy Police Det. John Haines arrested Guppy at Furnace Brook Parkway and Gray Street in Quincy for breaking and entering a residence on Willard Street. Guppy was a heroin addict at the time, consuming between ten and fifteen bags per day. Ordinarily he would take three bags of heroin in the morning, two or three around noon, two more mid-afternoon, and at least two in the evening. He took his last dose before Friday, September 16, sometime during the evening of September 15. On Friday Guppy consumed eight to ten bags of heroin and a bag of cocaine; he took his first dose of heroin at about 8:30 a.m., and the last at about 4:00 p.m. During that time he also drank from a pint of 151 proof rum. Guppy took no more heroin or cocaine after 4:00 p.m.; between that hour and his arrest he finished the pint of rum.
Lorraine Alebord, a registered nurse, had befriended Guppy several months earlier, and had soon learned that he was an addict. She had observed marks on his arms which she recognized, from her nursing experience, as needle track marks. During the summer of 1994 Guppy had admitted his addiction, and she had attempted without success to get him into a detoxification program.
At approximately 7:45 a.m. on Friday, September 16, on her way to work, Alebord met Guppy in a parking lot at an Oseo drugstore in Abington. She observed that he was shaking and had chills, and at one point vomited bile into a plastic cup. His condition was typical of his physical state each morning before he obtained his first dose of heroin, and was consistent with having taken his last dose sometime the previous evening. Guppy was evasive and argumentative with Alebord; she refused his request to stay at her house, but gave him a sleeping bag and money for food. Alebord’s conversation with Guppy lasted about fifteen minutes.
At approximately 7:30 p.m. that evening, Det. Haines was off duty, driving on Furnace Brook Parkway in Quincy. He saw a vehicle parked near the Bernazzani School begin moving, and followed it to Willard Avenue. There the driver got out, walked several feet from the car, then returned to the car and drove back to Furnace Brook Parkway. When Det. Haines arrived at the latter location the car was not occupied. Det. Haines next saw a person across the street in the bushes in front of a house. Because the car fit the description of a car involved in unsolved housebreaks, Det. Haines called for backup. He then *12 drove across the street, at which point the suspect walked quickly up Gray Road, and threw something to the side on a lawn. Det. Haines had observed nothing unusual to this point in the manner in which the suspect either walked or drove.
After the detective identified himself, the suspect identified himself as “Richard Guppy.” Other officers had arrived by this time, and had retrieved apparently stolen items from the lawn. Det. Haines gave Guppy the Miranda warnings, Guppy said that he understood them, and that it was “fine" that he speak with the detective. Det. Haines and Det. Curtis, who had arrived, questioned Guppy at the scene about a housebreak on Willard Street, to which Guppy admitted. Asked where the television from that break was, Guppy stated that it was going for drugs, that “I’m on drugs, I’m all fucked up.” Guppy appeared to be disheveled, butwas aware ofhis surroundings, understood what was being said to him, understood his rights, and had no difficulty speaking. Guppy agreed in his testimony at the motion hearing that he was not in withdrawal from heroin addiction at the time of his arrest, and stated that he was still intoxicated by the heroin, cocaine and alcohol he had ingested that day. Guppy was then arrested for breaking and entering at the Willard Street residence, and was transported to the Quincy police station. A search ofhis car revealed a gun and a hypodermic needle.
Guppy was booked at the Quincy police station at approximately 9:00 p.m. by Sgt. Peter Turowski. While Guppy was “rough looking,” Sgt. Turowski noticed no physical difficulties or difficulty answering questions. Sgt. Turowski noted on the booking sheet that Guppy had bruises on the insides of both arms.
About twenty minutes after being booked and placed in a cell, Guppy requested medical assistance. Emergency medical technicians were called, and arrived shortly thereafter. They examined Guppy for five to ten minutes and reported that he was “OK” and did not require transport to the hospital. Guppy testified that he was not feeling withdrawal at the time, but was anticipating withdrawal while in his cell.
As James O’Brien, M.D., testified, one in Guppy’s circumstances will begin to experience the early stages of heroin withdrawal between six and eight hours after his last dose of heroin. Between 10:00 p.m. and midnight on September 16, Guppy began to feel the cravings, inritability, anxiely, restlessness and aches associated with early withdrawal. Thereafter, in the early morning hours, and not later than approximately 4:00 a.m. Saturday, September 17, more serious physical symptoms began. From that time forward, Guppy experienced nausea, vomiting, chills, diarrhea, and stomach pains. These are similar to the symptoms which Lorraine Alebord had observed the previous morning, but were more severe because Guppy had taken his last dose of heroin on Friday about five hours earlier than was usual, and had not had his usual daily total dose on Friday. His withdrawal symptoms increased in intensity into the late morning hours on Saturday, continuing over the weekend and peaking between Saturday and Sunday evening. Thereafter, they began gradually to abate, and by Friday, September 24, Guppy’s withdrawal from heroin was complete.
During the period beginning in the early hours of Saturday morning, September 17, 1994, to Sunday evening, September 18, as Dr. O’Brien testified, Guppy was under a physical and psychological compulsion to obtain heroin (or a heroin substitute) so that his withdrawal symptoms would cease. During that time he was (and appeared to be) alert, and did not appear to be markedly impaired.
At approximately 8:00 a.m. Saturday, September 17, Det. Haines and Det. Ralph Ames of the Quincy Police took Guppy from his cell to a room near the booking area. Det. Haines advised Guppy of his Miranda rights, and asked him if he understood them. Guppy answered that he did, and he did in fact. Det. Haines asked Guppy if he was willing to speak to them. Guppy said that he felt sick and needed medical attention. His subsequent agreement to speak to the officers was the result ofhis desire to receive treatment for his withdrawal, and his expectation that treatment would be forthcoming after he spoke with them. I find that Guppy’s waiver ofhis Miranda rights at that time was not voluntary.
Shortly thereafter, Det. Haines and Det. Ames escorted Guppy to an unmarked police car and drove him to the previous night’s arrest scene at Furnace Brook Parkway and Gray Road, where Guppy made statements about his activities just before his arrest. Next, the officers drove Guppy to other locations in Quincy, at which Guppy discussed his participation in various housebreaks.
The detectives returned to the station at midmorning, where they met with Det. Elliot Gabriel of the Weymouth police. Det. Gabriel joined Det. Haines and Det. Ames in the car with Guppy. Det. Haines again advised Guppy of his Miranda rights; Guppy again agreed to talk, because he believed that the sooner he was finished talking the sooner he would receive medical treatment for his withdrawal. Det. Gabriel and Guppy discussed an unsolved housebreak on Webster Street in Weymouth. Thereafter the officers drove Guppy to several locations in Roxbuiy where Guppy had indicated he had traded stolen goods for narcotics. The group returned to the Quincy police department after about an hour, arriving before noon. Guppy was returned to his cell.
Det. Haines then called Braintree and Randolph police. Det. John Hamelburg of Randolph arrived at noon and met with Guppy in a room at the Quincy police department. After reading Guppy his Miranda rights, which Guppy waived, Det. Hamelburg discussed with Guppy two unsolved housebreaks in Randolph. Guppy agreed to waive his rights because, as *13 before, he believed that the sooner he was finished talking the sooner he would receive medical treatment for his withdrawal. Det. Hamelburg testified that Guppy told him that he was a heroin addict, that he' would get sick shortly if he did not see a doctor, and that he had previously asked for medical treatment. Det. Hamelburg also testified that he was “under the impression” that Quincy police were to take Guppy to a medical facility. After Guppy stated that he thought he would “be sick," Det. Hamelburg ceased questioning Guppy.
At about 12:15 p.m. that Saturday an unidentified officer informed desk Sgt. Angus McEachern that, as the latter testified, Guppy was having heroin withdrawal. Sgt. McEachern directed that an ambulance be called: at 12:19 p.m., department records show, the Quincy police department summoned its contracted ambulance service for a “sick prisoner in the lockup.” After a cursory examination lasting less than a minute, the ambulance personnel determined that the prisoner would not be transported, and left at 12:26 p.m.
Approximately one hour later, Guppy was transported by ambulance to Quincy City Hospital, where he was evaluated and treated for heroin withdrawal. The treatment consisted of various drugs designed to relieve to some extent the symptoms Guppy was experiencing, including nausea and aches. The types and dosages of medications administered, together with the medications provided for periodic use over the next few days, were consistent with a diagnosis of moderate to severe heroin withdrawal. Although the medications eased some of Guppy’s physical symptoms, they had minimal effect on his withdrawal, and they did not relieve his compulsion to obtain heroin to end the withdrawal.
Sometime late Saturday morning or early afternoon Lorraine Alebord telephoned the Quincy police department and spoke with Sgt. McEachern. She explained that Guppy had left a message on her answering machine, and that she was a nurse and a friend of Guppy’s. She asked how Guppy was, and told Sgt. McEachern that Guppy was a drug abuser, was veiy sick, and needed help. Sgt. McEachern responded that she should not worry, that the police would take care of Guppy.
Guppy was transported from Quincy City Hospital back to the police station at approximately 3:00 p.m. Saturday, September 17. Beginning at 9:00 p.m. that evening, and every six hours over the remainder of the weekend, police personnel administered to Guppy the medications prescribed at the hospital.
At approximately 5:30 p.m. that Saturday, following Guppy’s return from the hospital, Sgt. Mary Ellen Scannell and Lt. Carl Ohman of the Weymouth police arrived at the Quincy police station. The two had been notified by Quincy police that Guppy, whom witnesses in Weymouth had earlier identified as the perpetrator in a housebreak, would speak with them. After meeting with Quincy police detectives Murphy and Curtis, the Weymouth officers met with Guppy in an interview room. Guppy, in moderate to severe heroin withdrawal, walked into the room wearing a blanket, which he kept on throughout the interview. Lt. Ohman advised Guppy of his Miranda rights; Guppy indicated that he understood, and would talk with the officers. Guppy spoke with the Weymouth officers for about half an hour, during which he admitted to housebreaks in Weymouth. His agreement to waive his Miranda rights was knowing; inasmuch as Guppy had no further expectation of medical treatment at that time, I find that his waiver and his statements on Saturday evening, were also voluntary.
On Sunday, September 18, at about 1:00 p.m., Det. James MacDonald of the Braintree police interviewed Guppy for about ten minutes with respect to unsolved housebreaks in Braintree. Det. Haines was present during the interview. Det. MacDonald advised Guppy of his Miranda rights, and Guppy agreed to waive them. Guppy admitted to the housebreaks. Det. MacDonald was aware at the time that Guppy was a heroin user, and that he had not had a dose since his arrest on Friday.
At the time of the interview on Sunday, Guppy was in severe heroin withdrawal. He continued to receive his medications, and had no expectation of further medical treatment. He was free either to speak to the officers or to refuse to speak. He was alert and aware. Accordingly, I find that his waiver, and his statements, were knowing and voluntary.
Guppy appeared in Quincy District Court on Monday, September 19, 1994, where he had been transported from the Quincy police station. Alebord was there, and observed that he was bending over and holding himself in a manner that she recognized from her nursing experience as indicating that he had cramps. She also observed that he was perspiring profusely, was gray in color, and was incoherent. Alebord was fifteen to twenty feet away from Guppy at the time she made these observations.
After his court appearance, Guppy was transported to the Norfolk House of Correction, where he was referred to the medical staff on an emergency basis because of nausea, vomiting and malaise. He was diagnosed as suffering heroin withdrawal, and was prescribed symptomatic medications consistent with that diagnosis. Several days later, Alebord visited him at the House of Correction, and observed that he looked healthier and did not appear to be in pain.
RULINGS OF LAW
In considering a motion to suppress statements of a defendant, the Court must determine (1) whether the police satisfied the requirements of Miranda v. Arizona, 38 U.S. 436 (1966); (2) whether the defendant knowingly, intelligently, and voluntarily waived his *14 Miranda rights; and (3) whether the defendant made his statements voluntarily. Commonwealth v. Selby, 420 Mass. 656, 660 (1995); Commonwealth v. Tavares, 385 Mass. 140, 145 (1982). “The presumption that a confession is voluntary merely places on the defendant the burden of going forward at the suppression hearing with evidence of involuntariness.’’ Tavares, supra at 151. It remains the Commonwealth’s burden to “prove voluntariness beyond a reasonable doubt.” Id. at 152.
“A statement is voluntary if it is the product of a ‘rational intellect’ and a ‘free will.’" Selby, supra at 662 (citation omitted). The Court must examine whether “in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act.” Id. at 663. Relevant factors “surrounding the interrogation and the individual characteristics and conduct of the defendant” include “promises or other inducements, conduct of the defendant, the defendant’s . . . emotional stability, . . . physical and mental condition, .. . and the details of the interrogation, including the recitation of Miranda warnings.” Id. (citations omitted); Commonwealth v. Magee, 423 Mass. 381, 386-89 (1996) (defendant’s physical and emotional condition as well as promise by police that defendant would receive medical attention rendered Miranda waiver neither knowing nor voluntary, and the defendant’s statements were involuntary); Commonwealth v. Hosey, 368 Mass. 571, 577 (1975) (where defendant was extremely “high” and emotional, and anxious to finish the interrogation so he could go to work, police wrong to induce waiver by stating that it would be difficult to obtain a lawyer).
When a defendant makes statements to police officers while suffering from drug withdrawal, “a heavy burden rests on the government to show that the defendant’s waiver of his constitutional rights, and subsequent confession, were voluntary.” Commonwealth v. Paszko, 391 Mass. 164, 175-76 (1984). See also Commonwealth v. Fielding, 371 Mass. 97 (1976) (if defendant is suffering from severe withdrawal, “confessions might be subject to question on grounds of involuntariness”). ”[S]pecial care is taken to review the issue of voluntariness where the defendant claims to have been under the influence of drugs or alcohol” when he made his confession. Commonwealth v. Mello, 420 Mass. 375, 383 (1995).
There is “no per se rule excluding as involuntary statements made during drug withdrawal," Paszko, supra at 175. Rather, the Court will examine each of several distinct custodial interrogations of Guppy in light of the above principles to determine, as to each, whether his waiver of Miranda rights was knowing and voluntary, and whether his statements were voluntarily given.
1.Statements to police on Friday evening, September 16, 1994
Guppy took his last heroin dose at about 4:00 p.m. on Friday, and although he admitted to police that he was on drugs at the time, he was not yet suffering from heroin withdrawal. See Commonwealth v. Parham, 390 Mass. 833, 838 (1984) (“intoxication alone is not sufficient to negate an otherwise voluntary act”). Guppy received and understood the Miranda warnings issued by Det. Haines at around 7:30 p.m. on Friday. Guppy knowingly and voluntarily agreed to speak to the detectives, and his statements to them that evening were voluntary. Guppy’s motion to suppress these statements and any evidence derived therefrom will be denied.
2.Statements made to police on Saturday morning, September 17, 1994
On Friday evening, Guppy told detectives that he was on drugs. Sgt. Turowski noted bruises on the inside of Guppy’s arms. Twenty minutes after being booked at Quincy Police Station that evening, Guppy requested medical assistance. During that night, Guppy began to suffer moderate to severe heroin withdrawal which intensified during the late morning hours on Saturday and continued through Sunday evening. At about 8:00 a.m. on Saturday morning, Guppy told Det. Haines that he was sick and needed medical attention. At about noon Saturday, Guppy told Det. Hamelburg that he was a heroin addict and would get sick shortly if he did not see a doctor. Det. Hamelburg ceased questioning Guppy after he stated that he thought he would “be sick." Sometime late Saturday morning or early afternoon, the Quincy Police learned from Lorraine Alebord that Guppy was a drug abuser, very sick, and in need of help.
Knowing what they did about Guppy’s physical condition and his requests and probable need for medical attention, the officers should have been alert to the strong possibility that Guppy’s waiver of his Miranda rights and subsequent statements were not voluntary. Hosey, supra at 577. Guppy’s waiver of his rights and cooperation with police arose from his desire for medical attention, and his belief that the sooner he talked, the sooner he would receive medical attention. Cf. Magee, supra at 387-88 (promise by police that defendant would receive medical attention after defendant spoke to them “established a quid pro quo situation which certainly affected the defendant’s capacity for a knowing and voluntary waiver” and for voluntary statements).
Accordingly, Guppy’s motion to suppress statements made to police officers between 4:00 a.m. and 1:30 p.m. on Saturday, September 17, will be allowed.
3.Statements made police at approximately 5:30 p.m. Saturday, September 17
The treatment and medication Guppy received on Saturday afternoon eased his withdrawal symptoms *15 somewhat, but did not relieve his compulsion to obtain heroin to end his withdrawal. Nevertheless, on Saturday evening Guppy had no expectation that he would receive further medical treatment, and he knew that he would received periodic medication to ease his symptoms. In the circumstances, his waiver of his Miranda rights that evening was knowing and voluntary, and his statements to Weymouth police officers were voluntary and will not be suppressed.
4. Statements made to police at about 1:00 p.m. on Sunday September 18
Det. MacDonald, aware that Guppy was a heroin user who had had his last dose of heroin almost forty-eight hours earlier, advised Guppy of his Miranda rights in the presence of Det. Haines and proceeded to interview Guppy. Lorraine Alebord’s observations of Guppy on Monday morning confirm that Guppy continued to suffer from severe heroin withdrawal. Nevertheless, Guppy’s circumstances on Sunday afternoon had not appreciably changed from the previous evening: he had no reasonable expectation of further medical treatment that day, he was alert and aware, and he was free to speak or not as he chose.
Accordingly, the statements Guppy made on Sunday, September 18 will not be suppressed.
ORDER
For the foregoing reasons, the motion to suppress is ALLOWED as to statements Guppy made to police between 4:00 a.m. and 1:00 p.m. on Saturday, September 17, 1994, and is otherwise DENIED.