Neel, J.
Defendant Angel Pizarro is charged with rape of a child by force, indecent assault and battery on a child, kidnaping, and related charges arising out of incidents allegedly involving two separate victims. He moves to suppress his statements to police, alleging that they were obtained in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Articles Twelve and Fourteen of the Massachusetts Declaration of Rights. Defendant further alleges that his statements were not fully, fairly and accurately recorded, in violation of the Fifth, Sixth, and Fourteenth Amendments, and Article Twelve.
An evidentiary hearing was held at which the Commonwealth presented the testimony of David Geoffroy, Inspector of the Criminal Bureau of the Lowell Police Department, and Carlos Ramirez, a Lowell police officer. Defendant called Susan M. Ott, Ph.D., a psychologist, and Ronald S. Ebert, Ph.D., a forensic psychologist. For the reasons stated below, the motion is allowed.
FINDINGS OF FACT
Based upon the credible evidence presented at the hearing, and inferences reasonably drawn therefrom, I find as follows.
Defendant was arrested by Lowell police and booked shortly before midnight on July 3, 1996, following a complaint by a male juvenile that defendant had kidnaped and raped him. At the police station defendant was stripped of all his clothing (taken as evidence), and left naked for approximately twenty-two hours in a cell with no mattress. During that period police gave him no clothes; they may or may not have supplied one or two blankets. The Commonwealth did not offer evidence explaining satisfactorily either the failure to clothe defendant, or the delay in questioning him.
At about 10 p.m. on July 4, 1996, Inspector Geoffroy and Officer Ramirez visited defendant at his cell. When they arrived, defendant was naked. Inspector Geoffroy inquired, through Officer Ramirez as translator (defendant, who is Puerto Rican, speaks little or no English), whether defendant wanted to talk about what had happened. Defendant agreed to speak to them. After defendant agreed, the officers gave him clothing, which he donned. The three then went to a Criminal Bureau office.
The office had a desk with a computer, and three chairs. Defendant was not handcuffed; he may have been shackled in accordance with Lowell police department policy. Inspector Geoffroy sat in front of the computer, and defendant and Officer Ramirez sat also. Inspector Geoffroy spoke to defendant through Officer Ramirez, whose sole responsibility was to interpret.
Inspector Geoffroy again asked defendant if he agreed to speak, and defendant again said that he did. Inspector Geoffroy then asked Officer Ramirez to read defendant the Miranda rights. Officer Ramirez read to defendant from a blue card bearing the rights in Spanish, then handed defendant the card and asked him to read it. Neither officer knew at that time that defendant could not read. Neither officer at any time spoke to defendant in English.
When he had finished reading the rights aloud in Spanish, Officer Ramirez asked defendant if he had understood what had been read. Defendant responded “yes” without hesitation. Defendant did not inquire about his rights, nor say that he did not understand what they meant. At Officer Ramirez’ request, defendant signed the blue Spanish Miranda card, as did the two officers.
Officer Ramirez is from Colombia, and the Colombian and Puerto Rican dialects of Spanish differ in the meanings of certain words. None of those differences made a material difference in the meaning of the words used by Officer Ramirez in his conversation with defendant, and in particular did not alter the meanings of words used in the Miranda rights.
*485 At Inspector Geoffroy’s direction, Officer Ramirez also translated for defendant the department’s six-hour waiver form, so-called, used to obtain consent to questioning of an arrestee who has been held for more than six hours before being arraigned. The form was in English only. After Officer Ramirez translated it, Inspector Geoffroy asked defendant if he understood it, and whether he consented to questioning. Defendant responded that he did.
The interview lasted about an hour. As defendant described what had happened, Officer Ramirez interpreted for Inspector Geoffroy. After defendant had run through his version once, Inspector Geoffroy asked him to repeat it while the Inspector typed the statements into the computer. After giving his statement, defendant told the officers that he could not read. Officer Ramirez interpreted the statement to defendant, after which defendant signed the statement.
During the interview defendant appeared to be and was sober and alert. He also appeared to be tired. As Inspector Geoffroy talked with him, telling him what the alleged victim had said, defendant denied the charges and gave his own version of events. Defendant had no difficulty answering the background questions appearing at the beginning of the form which became his written statement. At no time during the interview did either officer make any overt threats to defendant. Neither officer was aware that defendant had any mental deficit, nor was either trained to recognize signs thereof.
Dr. Susan Ott examined defendant twice in June 1997, for a total of three and one-half hours. She determined, based on tests which she caused to be . given to defendant, that defendant is mildly mentally retarded, with a performance IQ of 66. While mentally retarded, defendant does not qualify for Department of Mental Retardation residential support; with his adaptive skills, the appropriate treatment would be case management supervision in the community.
After her two interviews with defendant, Dr. Ott concluded that he has a very basic understanding of the roles of participants and the process of a trial. It took her two sessions of explaining those concepts to him for defendant to be able to achieve this basic understanding. In her opinion, there is a “serious question” whether defendant was able to understand his Miranda rights in the form and manner in which they were explained to him. She referred to defendant’s history of decompensating under stress, which reduces his ability to comprehend. She specifically opined that being held naked for nearly twenty-four hours before being questioned by police would both decrease his ability to comprehend his rights, and make him more acquiescent to the wishes of police officers.
Defendant’s statements to the officers contradicted those of the alleged victim, and indicate an ability to resist any suggestion that he committed the alleged crimes. On the other hand, defendant acquiesced to the officers’ initial request that he talk with them, and that he waive his rights to refuse to do so.
Dr. Ronald Ebert interviewed defendant for about three hours in May 1997 to determine his competency and mental state. Dr. Ebert opined that defendant would have remarkable difficulty in understanding either the Miranda rights or the six-hour waiver form read to him in Spanish, and most likely would not have understood them in the circumstances of his questioning by Inspector Geoffroy and Officer Ramirez. Dr. Ebert concluded, based upon the psychological testing and evaluations by Dr. Ott and others, that defendant, while adaptive in certain ways in society, is easily manipulated without an advocate to protect him. Dr. Ebert testified that mentally retarded persons are more likely to acquiesce to authority figures in general. Where, as here, such a person is held nude for twenty-four hours after arrest, the likelihood that he will go along with police requests that he talk to them is increased. Dr. Ebert opined that defendant was in fact in a state of heightened anxiety at the time of his questioning by police.
Dr. Ebert did not fault the officers who questioned defendant, because defendant does not present as a mentally retarded person to the untrained eye. Dr. Ebert opined that, if appropriately questioned, with repetition and breaking down of questions, defendant is capable of understanding the Miranda warnings. The Court accepts the opinions of Drs. Ott and Ebert referred to above. The Court finds that, in some circumstances, defendant is capable of understanding and voluntarily waiving his Miranda rights; that, in the circumstances present at his interview with Inspector Geoffroy and Officer Ramirez on July 4, 1996, defendant was under unusual stress principally because, in addition to having been arrested and charged with serious crimes, which charges he understood, defendant had been kept naked for nearly twenty-four hours in a cell, and was given clothes only after agreeing to speak with police; that in those circumstances, with his mental deficiency, defendant was marginally able to understand his rights as repeated to him by Officer Ramirez; that, in the circumstances, defendant did not voluntarily waive those rights, because he was willing to do whatever the officers indicated they wanted him to do, i.e., to talk to them about the charges against him; and that, for the same reason, defendant did not make his statements voluntarily. That he denied those charges, and gave a detailed account in making his denial, does not derogate from the conclusion that his willingness to converse with the officers was not voluntary in the circumstances.
RULINGS OF LAW
In considering a motion to suppress statements of a defendant, the Court must determine (1) whether the police satisfied the requirements of Miranda v. Arizona, 38 U.S. 436 (1966); (2) whether the defendant *486 knowingly, intelligently, and voluntarily waived his Miranda rights; and (3) whether the defendant made his statements voluntarily. Commonwealth v. Selby, 420 Mass. 656, 660 (1995); Commonwealth v. Tavares, 385 Mass. 140, 145 (1982). “The presumption that a confession is voluntaiy merely places on the defendant the burden of going forward at the suppression hearing with evidence of involuntariness.” Tavares, supra at 151. It remains the Commonwealth’s burden to “prove voluntariness beyond a reasonable doubt." Id. at 152.
“A statement is voluntary if it is the product of a ‘rational intellect’ and a ‘free will.’ ” Selby, supra at 662 (citation omitted). The Court must examine whether “in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act.” Id. at 663. Relevant factors "surrounding the interrogation and the individual characteristics and conduct of the defendant" include “promises or other inducements, conduct of the defendant, the defendant’s . . . emotional stability, . . . physical and mental condition,... and the details of the interrogation, including the recitation of Miranda warnings.” Id. (citations omitted).
The defendant has presented persuasive evidence that his waiver of his Miranda rights, and his statements to police, were not voluntary. The defendant’s mental deficiency, while not so severe as to prevent him from functioning in society, was serious enough to merit special scrutiny of any such waiver, especially so in the circumstances of this case. For reasons not adduced at the hearing, police kept defendant in a particularly vulnerable state for twenty-four hours. Relief came in a manner that one with defendant’s diminished mental capacity more probably than not interpreted as a quid pro quo: in exchange for agreeing (while in his cell) to speak to police officers, defendant was allowed to have clothes. That defendant repeated his agreement to speak to the officers when he and they arrived at the Criminal Bureau office, shortly after defendant dressed himself, does not lead the Court to conclude that the officers’ perhaps unwitting coercion of defendant in his cell did not continue, at least in defendant’s mind, in the interview room.
As Drs. Ott and Ebert indicated, defendant is capable, in certain circumstances, of understanding his Miranda rights, and of waiving them. Absent his twenty-four hour period of nakedness in a jail cell, in the circumstances presented here defendant may have been able to do so knowingly and voluntarily. In view of his treatment prior to his making the statements, and the manner in which that treatment predisposed defendant to bow to the requests of authority figures without adequate consideration of the consequences, however, the Court concludes that defendant did not voluntarily waive his Miranda rights, and did not make his statements voluntarily.
ORDER
For the foregoing reasons, the motion to suppress is ALLOWED.