Agnes, Peter W., J.
1. Introduction. The defendant, Leslie Schuler, is charged by indictment with murder, assault and battery causing serious bodily injury, assault and battery by means of a dangerous weapon, as well as other charges in connection with the death of his seven-year-old son Nathaniel. The defendant has filed a motion to suppress statements he made to the Worcester Police Department at the Worcester Police Department. The statement was video-and audio-recorded. Based on the credible evidence presented at the hearing conducted on June 13, 2011 and my review of the audio-and video-recorded interview of the defendant, I make the following findings of fact and rulings of law.
2. Findings of fact. Detective Donna Bursette of the Worcester Police Department was called to Saint Vincent’s Hospital on June 22, 2009 based on reports of an injured child. She learned that the defendant, Leslie Schuler, and his girlfriend, Tiffany, brought the defendant’s seven-year-old son, Nathaniel, to the hospital emergency room. The child was unresponsive. The defendant told hospital personnel that the boy had fallen from his bicycle. The defendant was not under arrest or in police custody when he told the police at the hospital that Nathaniel had fallen off his bicycle several days earlier. The police were aware from hospital personnel, that the child appeared to have suffered a traumatic brain injuiy, and that he was covered with bruises. There were no signs of intoxication or drug use by the defendant, and he did not exhibit any signs of physical distress or discomfort. A doctor told the police that the boy was covered in bruises and had suffered a brain injury that was not consistent with injuries from a fall from a bicycle. The doctor also told the police that she believed the injuries suffered by the child had been inflicted and were new. The defendant and his girlfriend were asked to come to the police station to answer some additional questions. They agreed. The first interview of the defendant took place in an interview room at the police station. The defendant was not in handcuffs or restrained in any way. The interview began at approximately 1:00 p.m. and continued to about 3:00 p.m. At this point, the defendant was arrested on an unrelated warrant, booked and placed in a cell. The defendant remained alone in his cell from 3:00 p.m. until about midnight. The defendant was brought back to the interview room at midnight. He was questioned a second time by detectives Bursette and LaLiberty.
3. Hospital interviews. The defendant made statements to hospital personnel about his son’s condition and the cause of the injuries. There is no evidence in the record before me that the statements made by the defendant to hospital personnel and police officers at the hospital were other than voluntary. Volunteered statements to hospital personnel do not implicate the Miranda doctrine. See Commonwealth v. Snyder, 413 Mass. 521, 532 (1992). See also Miranda v. Arizona, 384 U.S. 436, 478 (1966) (“Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding *621 today”); Commonwealth v. Loadholt, 456 Mass. 411, 420-21 (2010) (“If a statement is spontaneous and unprovoked, or is volunteered by a defendant without improper probing questioning, then it is not the product of custodial interrogation”); Commonwealth v. Brum, 438 Mass. 103, 115 (2002), S.C., 441 Mass. 199 (2004) (“Spontaneous and unprovoked statements are admissible even if made after a defendant has invoked his right to remain silent”). As for the brief conversation between the police and the defendant at the hospital, the defendant bears the burden of demonstrating that these statements were the product of custodial interrogation. See Commonwealth v. Larkin, 429 Mass. 426, 432 (1999). There is no evidence that the defendant was in custody at any time while at the hospital.
4. First interview. The defendant was seated at a table in an interview. He was not cuffed or restrained. He appears calm and relaxed. The police officers introduced themselves to the defendant and informed him that the interview was being recorded electronically. After gathering some biographical information, the defendant was informed of his Miranda rights. He acknowledged that he understood each Miranda right in a quiet and polite voice. He signed a Miranda waiver form, exhibit 2, and specifically agreed to speak to the police. See Transcript, exhibit 3 at 4-6. The interview began with questions about the circumstances that led the defendant to bring Nathaniel to the hospital that morning. The questions by the police were put to the defendant in a non-aggressive and conversational tone. The defendant was extremely polite, and spoke in quiet tones. However, there were no signs of intoxication or drug use by the defendant, and he did not exhibit any signs of physical distress or discomfort. The interview then moved to events and activities during the days before Nathaniel was brought to the hospital. According to the defendant, on the evening of the Thursday before the Monday he brought Nathaniel to the hospital, the boy fell off a bicycle. See Transcript, exhibit 3 at 24. The defendant stated that his son suffered only “a couple of little scrapes." See Transcript, exhibit 3 at 24. The defendant maintained that he was not aware of any other unusual events that might account for the child’s injuries. On the next day, Friday, the defendant stated that he noticed a few bumps and bruises on his son’s body. See Transcript, exhibit 3 at 32-33. The defendant was then questioned about how he disciplined Nathaniel. See Transcript, exhibit 3 at 33 et seq.
5. During this first interview, the police learned that the defendant had only become aware that he was the victim’s father about three months earlier. The defendant traveled to Alabama to pick up Nathaniel for a visit with the defendant in Massachusetts and had only had the child living with him for about one month before the homicide. See Transcript, exhibit 3 at 44-47. As the interview proceeded, the defendant characterized the victim’s fall from the bicycle as more severe than just a few scrapes. See See Transcript, exhibit 3 at 52-53. At no time during the interview did the defendant’s demeanor change—he remained calm and measured his answers carefully even as the police became more accusatory.
6. When the defendant told the police that he “spanked” his son only once and “it hurt me so deep because all I could remember is what my grandmother did to me and how that made me feel.” See Transcript, exhibit 3 at 56. The defendant told the police he had been beaten as a child by his grandmother and it made him “angry.” See Transcript, exhibit 3 at 56-57. The questioning at times became accusatory over the defendant’s description of “time-outs” and his practice of confining Nathaniel to his room. See Transcript, exhibit 3 at 81 et seq. When the police pressed him about the practice of confining Nathaniel in his room for long periods of time, the defendant claimed the boy did not want to leave his room. See Transcript, exhibit 3 at 87.
7. At one point during this first interview, the police questioning directly challenged the truth of the defendant’s account by stating that the child’s injuries were not consistent with a four-day-old bike accident, and added that doctors at the hospital stated that the child exhibited “fresh bruises,” that they were “large,” and that the child had “fingerprints on his neck.” See Transcript, exhibit 3 at 95-96. After a general denial, the police persisted by stating “(s)omebody put their hands on that kid. It was either you or Tiffany, so let me know which one.” See Transcript, exhibit 3 at 96. Without any change in demeanor or sign of stress or distress, the defendant told the police that Tiffany did not hit Nathaniel and that he did not hit him. See Transcript, exhibit 3 at 96-97.
8. The interview of the defendant continued with questioning about the events of that morning before the child was brought to the hospital, and the reasons why an ambulance was not called. Once again, the defendant remained calm and his demeanor did not change. The police informed the defendant that they had interviewed his girlfriend, Tiffany, and that she told them he had never been alone with the child since he first came to Worcester from Alabama. The defendant agreed with that comment. See Transcript, exhibit 3 at 102-03. The police questioning again became sharp and accusatory as the police informed the defendant that his child “had bruises all over on his upper body.” See Transcript, exhibit 3 at 104. The defendant continued to deny knowledge of what happened and to deny any responsibility adding that he typically checked on his son’s condition several times during the night. See Transcript, exhibit 3 at 105-06. The police questions suggested several times that the defendant did not intend to hurt his son, but that he acted accidentally. See Transcript, exhibit 3 at 122. At some point, the defendant acknowledged that he *622 might have grabbed his son during wrestling and inflicted bruises by accident. See Transcript, exhibit 3 at 116-154. Once again, despite the persistent, accusatory questions and the suggestions by the police that the defendant did not purposely or intentionally inflict injuries on the child, the defendant continued to remain calm and denied responsibility. The first interview concluded at 3:10 p.m. See Transcript, exhibit 3 at 168.
9. Second interview. At the close of the first interview, the police informed the defendant that there was a warrant for his arrest. He was arrested and placed in a cell. The second interview commenced shortly after midnight and lasted about one hour. The defendant was taken to the same room in which he sat for the first interview. The defendant was again informed that the interview was being electronically recorded. The defendant appears to be alert and calm. There are no signs of impairment. He does not appear to be confused. The defendant asks about his son and the police reply that they have no news to report. The police advise the defendant of his Miranda rights again. The defendant responds that he understands his rights and is willing to talk to the police. See Transcript, exhibit 3 at 168-70. The defendant restated his earlier position that he has no explanation for the child’s injuries. See Transcript, exhibit 3 at 171. The defendant added, for the first time, that his son was at home with his girlfriend, Tiffany, for two days during the past week. Soon thereafter, the police challenge the defendant by stating that after a long conversation with Tiffany, “she told us how many times you hit him, how you nailed on him, how you hit him in the stomach. You remember that? Do you remember that?” See Transcript, exhibit 3 at 174. Although the defendant responded in the negative, he soon makes an admission—"I’m ashamed of myself for hitting him." See Transcript, exhibit 3 at 177. The defendant is not unequivocal in taking responsibility for Nathaniel’s injuries, but states that he “slapped him on his chest . . . four or five [times].” See Transcript, exhibit 3 at 179-80. The defendant also admitted hitting Nathaniel in the stomach. During this phase of the interview, the defendant’s demeanor is subdued. He often has his head down and his voice is quieter than during the earlier part of the interview. The defendant makes further admissions in the form of physical abuse of the child including throwing or pushing the child through a wall. The interview ends with an emotional statement by the police officers accusing the defendant of seriously injuring the child and essentially allowing the boy to die. See Transcript, exhibit 3 at 233-34.
10. Discussion. Voluntariness. The Commonwealth has the burden of proving beyond a reasonable doubt that the defendant’s statements were voluntary. A statement is voluntary if it is the product of a “rational intellect” and a “free will,” and not induced by physical or psychological coercion. See Commonwealth v.-Selby, 420 Mass. 656, 662, 663 (1995), S.C., 426 Mass. 168 (1997); Commonwealth v. Davis, 403 Mass. 575, 581 (1988), S.C., 410 Mass. 680 (1991). In making this determination, the court must consider the totality of the circumstances. The factors include “whether promises or other inducements were made to [the defendant] by the police . . . [the defendant’s] age, education and intelligence... his experience with the criminal justice system . . . his physical and mental condition . . . whether he was under the influence of drugs or alcohol. . . and the details of the interrogation, including the recitation of Miranda warnings . . .” Selby, supra, 420 Mass. at 663 (citations omitted). A voluntary confession is one that in the totality of the circumstances is “the product of an essentially free and unconstrained choice by its maker.” Schneckloth v. Bustamante, 412 U.S. 218, 225 (1973).
11. There is no evidence in this case that the defendant’s will was overborne by the police questioning, even when it became accusatory and dismissive of the account of the events being given by the defendant. Throughout the two recorded interviews the defendant’s demeanor remained essentially the same. The videotape reveals that he remained in control of himself and does not ever appear overcome with emotion. Contrast Commonwealth v. Magee, 423 Mass. 381, 386—387 (1996) (statements involuntary after seven hours of prolonged questioning, while defendant, in exhausted state, cried, and shook uncontrollably). The police treated the defendant with respect, even though at times they challenged his account. The police did not resort to any physical coercion. The defendant’s answers appeared to be carefully calibrated to admit some responsibility, but not full responsibility, for the injuries suffered by Nathaniel. The defendant appears to be a person of average, if not above average, intelligence. He is certainly not a person of low intelligence. The defendant’s answers appear to be independent of the suggestions made to him by officers, as opposed to someone who simply repeats or restates what is said by the police. He expressed himself articulately. He did not appear to be fooled by the accusatory or challenging questions because he essentially stuck to his own narrative throughout the interrogation. He exhibited the capacity to be evasive when presented with questions that called for him to make admissions or give a full confession. No promises were made to the defendant to induce him to confess. The defendant did not ask for the interview to be suspended or an opportunity to consult with an attorney. The defendant did not ask for food or drink at any point during the interrogations. After a review of these factors, I am left with a firm conviction that the Commonwealth has proved beyond a reasonable doubt that the defendant’s statements were made voluntarily.
12. Waiver of Miranda rights. The Commonwealth has the burden of proving that the defendant made a knowing and voluntary waiver of his Miranda rights by *623 a standard of proof beyond a reasonable doubt. Here, the police advised the defendant of his rights orally and obtained a written waiver. Exhibit 2. There was no evidence of intimidation, coercion, or physical force in connection with the waiver sought by the police. See Commonwealth v. Mello, 420 Mass. 375, 384-85 (1995), and cases cited. There is no evidence that the defendant was under the influence of alcohol or drugs, or impaired due to any mental illness, or mental retardation. The defendant’s appeared to be calm and not overcome with grief or emotion, and expressed no hesitation or reservation about speaking to the police. He said he understood his Miranda rights, signed a written waiver (exhibit 2), and expressed no reservations about speaking to the police, times the questioning was intense, and it appears that the technique known as minimization was employed in that the police suggested that he may have inflicted injuries on his son by accident. See Commonwealth v. DiGiambattista, 442 Mass. 423, 435-36 (2004). Although minimizing the seriousness of the crime implies leniency, that tactic, standing alone, does not render the defendant’s statement involuntary. See Commonwealth v. O’Brian, 445 Mass. 720, 726-28 (2006). The nature of the defendant’s initial narrative, as he first related it to the police, simply conflicted with the basic facts. It was almost inevitable that if the defendant continued to speak to the police, as he chose to do, that he would have to modify and adjust his narrative to fit the facts. He tried to do just that, but found himself digging a deeper and deeper hole for himself. This is not a case where there is evidence that the defendant’s will was overcome by the length or intensify of the questioning. The defendant’s statements were voluntary by a standard of proof beyond a reasonable doubt.
13.Whether the defendant asserted the right to remain silent. The defendant maintains that at one point during the interview he asserted his right to remain silent, but the police did not scrupulously honor his assertion of the right to remain silent. See Transcript, exhibit 3 at 98-99. The police were pressing the defendant about why he did not call an ambulance to take Nathaniel to the hospital. When the defendant explained that in his opinion, ambulances take a long time, the police interrogator stated “not as long as it would take you to have a discussion with Tiffany about” how they would cover up the crime. The defendant’s response was “[a]ctually, we’ve gone over this. And, actually, I don’t want to discuss this because right now I feel like you’re badgering me, ma’am. I honestly, in my heart don’t feel like I did anything wrong.” See Transcript, exhibit 3 at 99. This remark by the defendant was followed by a question by the police about when the defendant arrived at the hospital. What then followed was a continuing series of questions and answers without any objections or reservations expressed by the defendant.
14. Whether the right to remain silent was asserted is a question of law for the court to determine based on a consideration of the totality of the circumstances. See Commonwealth v. Almonte, 444 Mass. 511, 519 (2005). See Mass. G. Evid. §(a) (3d ed. 2011). A person in police custody has the right not only to refuse to speak or answer any questions, but the right to terminate questioning at any time. Miranda, 384 U.S. at 473, 474. Accord, Commonwealth v. Senior, 433 Mass. 453, 463 (2001) (“[A] defendant has not only the right to remain silent from the beginning but also a continuing right to cut off, at any time, any questioning that does take place . . .”). “For the rule of Miranda regarding the termination of questioning to apply, there must be either an expressed unwillingness to continue or an affirmative request for an attorney.” Commonwealth v. Pennellatore, 392 Mass. 382, 387 (1984) (citations and quotations omitted).
15. There is a distinction between the assertion of the right to remain silent generally and the refusal to answer some questions. In Senior, the SJC held that the defendant’s refusal to answer a question concerning where he had been drinking, while answering questions both immediately prior to and subsequent to that question, did not constitute the assertion of the right to remain silent. The subject also has the right to answer some questions but not others, and, after exercising the right to terminate questioning to decide when, if at all, to resume the interview. See Commonwealth v. Roberts, 407 Mass. 731, 733-34 (1990) (SJC notes that the mere refusal of the defendant to answer certain questions was not an assertion of the right to remain silent. The police are not required in such a case to ask defendant if he wishes to stop the interview.). Because the defendant has the choice whether to refuse to answer any questions or to assert the right to remain silent selectively, the duty of the police to scrupulously honor a suspect’s assertion of the right to remain silent is not triggered until and unless the defendant has asserted the right to remain silent by an expressed unwillingness to speak. See Commonwealth v. Leahy, 445 Mass. 481, 488 & n.7 (2005). In this case, the context indicates that the defendant did not want to answer further questions about why he did not call an ambulance (“I don’t want to discuss this”), but did not assert his right to remain silent as to inquiries in other areas. I find by a standard of proof beyond a reasonable doubt that the defendant understood and waived his Miranda rights.
ORDER
For the above reasons, the defendant’s motion to suppress statements made to hospital personnel and police officers while at Saint Vincent’s Hospital, and statements made during two recorded interviews while in custody at the Worcester Police Department is DENIED.