Agnes, A.J.
The defendant is charged with arson of a dwelling house in violation of G.L.c. 266, § 1. On June 6, 2001, a hearing was held on the defendant’s motion to suppress evidence. Thereafter, the case was continued at the request of counsel so that counsel could arrange for the testimony of certain expert witnesses. After several continuances at the request of counsel, a hearing was scheduled for December 13, 2001. On that date, counsel informed the court that they were in agreement that the case should be submitted on the basis of the evidence offered at the hearing on June 6, 2001.
FINDINGS OF FACT
State Trooper Paul Horgan has been a member of the state police for nine years and has been assigned to the State Fire Marshall’s Office for the past seven years. He has previously been qualified as an expert witness by the Superior Court in connection with the issue of the cause and origin of fires.
On September 16, 2000, Trooper Horgan responded to the scene of a fire at 17 Portland Street in Haverhill, Mass. The fire was reported to the police at 1:25 a.m. The first responders found the rear area of the first floor fully involved in fire. An individual had to be removed by ladder from the second floor of the dwelling. Trooper Horgan met with local fire investigators and conducted an examination of the scene, including an inspection of the building. He concluded that the point of origin of the fire was a closet in the first floor, rear apartment and that the fire was incendiary in nature or at least of suspicious origin.
Toward the beginning of his inspection, Trooper Horgan talked to Michael Carter, who told him that he let a female friend, Ms. Richardene Whittier, stay in the apartment, which was under renovation and was being used for drugs. Horgan interrupted his investigation to interview Whittier at the Haverhill Police Station. At that time, Trooper Horgan’s preliminary investigation indicated that the fire had been set.
Trooper Horgan advised Ms.-Whittier of her Miranda rights. In her first statement, Whittier denied any knowledge of the origin of the fire. Trooper Horgan told her that he did not believe her and left her with a detective who had experience working with prostitutes.[1] In a second interview, Ms. Whittier changed her statement and said that she had left defendant at the apartment shortly before the fire, and that the defendant was angry because the owner of the apartment had taken his money and left without giving him cocaine.
At about 6:25 a.m., Ms. Whittier gave police a statement and agreed to help them locate the defendant. Trooper Horgan returned Ms. Whittier to the scene between 6:30 and 6:45 a.m. He was driving an unmarked police cruiser and wearing a black utility type suit bearing the insignia of the Massachusetts State Police. He had a state police canine with him in the cruiser. Shortly after 7:00 a.m., Trooper Horgan learned from the Haverhill Police that the defendant had been seen walking on Portland Street. The police responded and observed the defendant on a porch knocking on the door of a dwelling house on Portland Street.
Trooper Horgan, accompanied by Haverhill Fire Investigator Edward Sevinsky, approached the defendant, identified himself and Sevinsky and asked defendant to identify himself. When defendant asked “what’s this about?,” Trooper Horgan asked him to come to the police station. Trooper Horgan made no reference to the fire, merely stating that he was conducting an “investigation.” He did not inform the defendant that he might be a suspect. Defendant replied that he was going to a funeral and it was important for him to talk to the woman who was standing on the porch, who was his sister Letizia.[2]
Letizia explained that they were making preparations to attend their Aunt Antoinetta’s[3] funeral in Springfield and asked if she should await the return of the defendant before leaving for the funeral. Trooper Horgan told her that he thought it would probably take too long and that she should go to the funeral. He said that the conversation with defendant might take all day. Letizia asked her brother if he was in trouble and he said “no.” When defendant’s sister asked Trooper Horgan if he could conduct the interview later, he responded that it was very important and they needed to do it then. Defendant told his sister that he didn’t see any problem with having a conversation with police.
At this point, the defendant agreed to accompany the police to the station for an interview. I do not find credible Letizia’s testimony that her brother looked confused.[4] Letizia went to the police station, where she was told that her brother had not yet arrived. She went home and waited for about half an hour. When defendant did not call her, she went to the funeral with her father.
Trooper Horgan drove the unmarked vehicle containing the defendant to the Haverhill Police Station. Sevinsky drove his own automobile back to the sta *180 tion. The defendant, who sat in the front seat of Trooper Horgan’s vehicle, was not in handcuffs. He admired the vehicle, a new Chevrolet Impala, and asked Trooper Horgan some questions about the vehicle. Defendant then asked “What’s going on?” Horgan said “we’ll tell you at the police station.” During the approximately three to five minutes that it took to get to the station, the parties engaged in friendly conversation, which was not recorded. They entered the police station through a side door, walked into a foyer area and entered a 12’ by 12’ interview room containing two large desks and a large window. Trooper Horgan obtained a cup of coffee for the defendant.
Defendant sat with Horgan and Sevinsky at one of the desks near the window. Horgan told defendant that they were investigating a fire on Portland Street and that “all the evidence points to you.” He told defendant that before he asked him any questions, he had to read him his rights. Prior to this incident, defendant had never been arrested or in court. When defendant asked if he was under arrest, Horgan said “no.”
The defendant, who was 33 years old, did not appear to be under the influence of alcohol or drugs. He was steady on his feet; his voice was clear; and, in general, he acted in a normal and cooperative manner. Trooper Horgan read him his Miranda rights, one at a time, from a printed card. After each right was read, the defendant responded that he understood what Trooper Horgan had said. At approximately 7:25 a.m., at the conclusion of this exercise, the defendant signed and dated the Miranda card indicating that he understood his rights. See exhibit 2. He told the officers that he was exhausted and wanted to go to bed. He did not, however, exercise his right to remain silent, request a lawyer or attempt to stop the questioning.
During the interview, Trooper Horgan asked questions, while Sevinsky observed. Trooper Horgan began the interview by asking the defendant his age, date of birth and social security number. He learned that the defendant lived at 136 Winter Street, apartment number 2 in Haverhill Mass. He obtained the defendant’s home and work telephone numbers, and the identity of his employer (Snell Acoustics). The defendant said he had a child (Sabrina). When asked about whether he took any medications, the defendant stated that he took Allegra for allergies. The defendant had a high school education and had studied graphic arts at Northern Essex Community College. He was trained as a welder, had been employed for eighteen months and was fluent in both English and Italian. The defendant told the police that he had had a history of depression and psychiatric disease since the age of 16, including several hospitalizations.
The defendant described his activities beginning on Friday, January 15, 2000 at suppertime. It was a friendly atmosphere. Up to this point in the interview, the defendant had not supplied the police with any inculpatory information.
Trooper Horgan testified that the purpose of the 15-20 minute conversation was to permit the defendant to commit to an account of events without confrontation or challenge. Defendant provided an exculpatory statement and agreed with Trooper Horgan’s request to reduce it to writing. Trooper Horgan wrote out a four-page statement which the defendant read and reviewed, read aloud to Trooper Horgan, and signed and initialed. At no time did the defendant ask if he could leave or request a lawyer. Trooper Horgan then asked defendant some additional questions, reviewed defendant’s answers to those questions with him, and added the questionssigned, initialed and dated by defendantto the writing. See exhibit 3.
At this point in the interviewabout 9:20 a.m.defendant had made neither any admissions nor any inconsistent statements. The conversation had been normal and friendly. Trooper Horgan then left defendant in the room with Sevinsky and met with Haverhill Police Detective Lance Dawkins to discuss how the interrogation should proceed. Trooper Horgan decided to go back and challenge the defendant’s version of events. Detective Dawkins suggested a ruse in which Horgan would tell defendant that there was a telephone company building near the fire scene and ask defendant why he appeared on a surveillance tape from that company.
When Trooper Horgan re-entered the room, he told defendant that his statements were inconsistent with those of other witnesses and said that he knew that defendant had been at the fire location to buy drugs, and was angry that he had been ripped off. Defendant initially denied that he had been ripped off, stating that had happened to his friend Richard, not to him. In a normal but accusatory tone Trooper Horgan said “I know you’re lying.”
Trooper Horgan asked defendant if there was any reason why defendant would appear on the surveillance video near the time of the fire. Defendant responded “let me see the video.” When told that the DA had the video, defendant said “let me speak to the D.A.” When Trooper Horgan told defendant that the police could hold him at the station, Sevinsky interrupted and said “tell us what we want to hear. Work with us and we’ll work with you." Sevinsky said that if defendant just told the truth, he could “get out of here."
At that point in the interview, a man wearing a telephone company hard hat and utility belt entered the room cariying a videotape. The man, who was actually a Haverhill Police maintenance man dressed as a telephone worker, put the tape on the desk. Trooper Horgan had no idea whether there was any video surveillance at the telephone company and was unaware of the plan to use someone to “deliver” the *181 videotape. He decided it was part of the ruse orchestrated by Detective Dawkins and “just let it happen.” Trooper Horgan believed that the videotape was blank. He did not know that the man was a police department custodian, and never questioned him.
When defendant saw the tape on the table, he became quiet and subdued. He did not, however, ask to stop, to leave the room or to have an attorney. Trooper Horgan then asked defendant “Is there any reason why I should see you exiting the house shortly before the fire started if I looked at the tape?” The defendant was silent, then said “All right. I’m going to tell you what happened.” Trooper Horgan again advised the defendant of his Miranda rights and gave him a second card to sign. The defendant signed the card at 9:45 a.m., see exhibit 4, then proceeded to give a narrative while Trooper Horgan and Sevinsky listened. The second narrative was defendant’s first inculpatory account. Trooper Horgan again received permission to reduce defendant’s statement to writing, then wrote two pages and reviewed them with defendant. The defendant initialed and signed the second statement with some corrections at 10:20 a.m.
In his second statement, the defendant said that the fire started accidentally when he tried to get high by burning isopropyl alcohol on some drug residue left on a mirror. He stated that he thought he had put the fire out before he left the scene. At this time, Trooper Horgan had no idea that alcohol was involved in the origin of the fire and told defendant that his account was inconsistent with the trooper’s theory of how the fire started. Although Trooper Horgan thought that the defendant’s statement about the fire starting accidentally and then moving to the closet was highly unlikely, he thought that about 95% of defendant’s story was probably true. Trooper Horgan told defendant his theory, and about 15 minutes later defendant acknowledged that he had started the fire intentionally. After listening to defendant’s third statement, Trooper Horgan asked and received defendant’s permission to record it in writing. The defendant reviewed the one-page statement two times and signed it at 10:45 a.m. See exhibit 6.
The defendant’s demeanor remained unchanged throughout these events. Trooper Horgan asked him if he had any remorse and if he wanted to write an apology. The defendant said “yes” and did so, in his own handwriting, at 10:55 a.m. See exhibit 7. Trooper Horgan then asked the defendant to draw a diagram showing where the fire was set. The defendant, in his own writing, did so. See exhibit 8. Trooper Horgan asked the defendant if he would prefer to be tape recorded in his own words or to read his previous statement. The defendant chose to read his last statement and Trooper Horgan made an accurate and complete recording of defendant’s reading. See exhibit 9 (original).
In the recording, defendant stated that there had been no coercion, that he waived his Miranda rights, that he had made three statements to police and that the third statement was true. Defendant then read his third statement, which recounted that he set the fire with isopropyl alcohol with a match inside the closet, that the fire began with a four-inch-high flame, and that the defendant then left the apartment because he did not think the fire would burn. The interview ended at 10:54 a.m., and the defendant was arrested.
I do not find credible defendant’s testimony that (i) he did everything he was asked to do by the police and made untrue statements about starting the fire because he just wanted to get out of the police station and go to the funeral, (ii) he made untrue statements because he felt cornered and thought he had no choice and (iii) he signed the third statement after the police said that they knew what he did and why he did it because he thought he could make $500 in bail[5] and go to the funeral, and that he planned to tell the judge on Monday that his statement was not true.
RULINGS OF LAW
Pursuant to Mass.R.Crim.P. 13, defendant seeks to suppress as evidence all statements he made to Trooper Horgan and Officer Sevinski at the Haverhill Police Station on October 26 and 29, 2000. Defendant argues that the police detained him without adequate probable cause and obtained his statements in violation of Miranda v. Arizona, 384 U.S. 436 (1966), the Fifth, Sixth and Fourteenth Amendment of the United States Constitution and Article 12 of the Massachusetts Declaration of Rights.
1. Whether the Defendant was Under Arrest When Brought to the Police Station. The defendant voluntarily accepted the request by the police to accompany them to the police station. There was no physical force or coercion employed by the police. Before he left with the police, defendant told his sister that he had “no problem” having a conversation with the police.[6] Defendant was not shackled or handcuffed for the trip to the police station. Thus, there was no indication that a reasonable person would objectively have seen the initial interaction with police as tantamount to arrest. See Commonwealth v. Bryant, 390 Mass. 729, 736 (1984). See also California v. Beheler, 463 U.S. 1121 (1983); Commonwealth v. Gill, 393 Mass. 204, 212 (1984).
2. Whether the Defendant Voluntarily Waived His Miranda Rights. The Commonwealth has the burden of proving beyond a reasonable doubt that defendant made a voluntary, knowing and intelligent waiver of his Miranda rights. See Commonwealth v. Day, 387 Mass. 915, 920-21 (1983). Defendant suggests that his initial waiver was invalid because of his history of drug abuse and psychological difficulties and his distress over the death of his aunt. There is “no per se rule against admitting statements of individuals with mental disorders.” Commonwealth v. Rodriguez, 425 *182 Mass. 361, 366 (1977). See also Commonwealth v. Hartford, 425 Mass. 378, 380-81 (1997) (defendant’s limited reasoning ability did not warrant finding that he was incapable of making valid waiver).
In determining the voluntariness of a waiver, the court examines the totality of the circumstances at the time the waiver was made.[7] See Commonwealth v. Rodriguez, 425 Mass. 361, 366 (1997). Here, there is no evidence that, at the time of the police interview, defendant gave the police any indication or impression that he was incapable of understanding and waiving his Miranda rights. At the time he waived his rights, defendant appeared to be sober and did not appear to be under the influence of drugs. He had been employed for one and a half years, read and wrote English and was fluent in both English and Italian. He conversed normally with his sister and the police at his sister’s home and voluntarily accompanied police to the station after assuring his sister that there was “no trouble.” He had a friendly conversation with police on the way to the station. There was no evidence that defendant was coerced or that his mental facilities were impaired.
The evidence is clear that defendant received and understood his Miranda warnings before he made any statements to the police concerning the fire. After a friendly conversation on the way to the station, Trooper Horgan informed defendant that he had to be advised of his rights before any questioning took place. The trooper then read defendant his rights, one at a time, from a printed card. After each right was read to him, defendant stated that he understood what the trooper had said. Defendant then signed and dated a card indicating that he understood his rights. This written waiver indicated that defendant understood his Miranda rights and chose to speak with the officers despite having been advised of those rights. See Commonwealth v. Mello, 420 Mass. 375, 383 (1995).
3. Whether Police Use of a Ruse Invalidated the Defendant’s Waiver of Rights. Defendant argues that his statements were rendered involuntary when police tricked him by suggesting that they had a surveillance videotape of him leaving the fire scene. Police may not use trickery or deceitful tactics in an effort to obtain a waiver after a defendant has exercised his right to remain silent or requested counsel. See Commonwealth v. Edwards, 420 Mass. 666, 671 (1995). Here, however, defendant had made a valid waiver of his Miranda rights before the trickery occurred. See Commonwealth v. Forde, 392 Mass. 453, 454 (1984). In Forde, a defendant sought to suppress incriminating statements he had made to police after falsely being told that fingerprints could be taken from a corpse and that his fingerprints had been found on the victim. The Supreme Judicial Court noted that although any police interrogation after a defendant had asserted his right to remain silent would require suppression of the resulting statement, “the use of misinformation by the police does not in itself defeat a showing of voluntary waiver of rights.” Id. at 456. A defendant who has not asserted his right to remain silent “is not necessarily entitled to suppression.” Id.
The facts in this case are similar to those in Commonwealth v. Edwards, supra, 420 Mass. at 671. In Edwards, police asked a suspect who had waived his Miranda rights “how his handprint could have been found in the building if his statement that he had not entered the building was true.” Id. at 668. In fact, police had not found such a handprint and were using “a ‘ruse’ to induce Edwards to admit he had been in the building.” Id. at 669. The Court held that, prior to the ruse, Edwards had “made a knowing, voluntary and intelligent waiver of his Miranda rights.” Id. at 671. He had been coherent, alert and responsive throughout the interview, had never said that he wanted to remain silent or stop answering questions, and had not requested a lawyer. Under those circumstances, the Court held that Edwards had voluntarily waived his Miranda rights and that “the use of misinformation by the police does not in itself defeat a showing of voluntary waiver of rights." Id. at 671.
The Court rejected Edwards’ suggestion that an otherwise valid waiver necessarily becomes involuntary if police introduce falsely incriminating information into an interrogation. Id. at 672. Although the Court acknowledged that might be true in some instances, it held that in the totality of the circumstances of Edwards, “the indisputably valid waiver . .. remained voluntary throughout the interrogation and was not rendered involuntary by the use of the false handprint.” That is the situation here. Neither “(t]he characteristics of the accused [n]or the circumstances of the interrogation suggest that the defendant’s waiver of his Miranda rights was anything but knowing, voluntary and intelligent.” Forde, supra, 392 Mass. at 453. Here, the police were not dealing with an individual who appeared to be impaired by drugs or alcohol, or who gave them any indication that he was in psychological or emotional distress. He was sober, alert and lucid throughout the interview. As in Edwards, the valid waiver in this case is not invalidated by the fact that the police subsequently suggested that they had a videotape of defendant leaving the fire scene.
4. Voluntariness of Defendant’s Statements to Police. In addition to the validity of defendant’s waiver of his Miranda rights, the court must determine whether the defendant’s statements were themselves voluntary. In making that determination, the court looks to the totality of the circumstances “surrounding the making of the statements themselves ... to determine whether they were the product of a ‘rational intellect’ and a ‘free will.’ ” Edwards at 673, quoting Commonwealth v. Selby, 420 Mass. 656, 662 (1995). The determination that in this case the defendant made a knowing, intelligent and voluntary waiver of his Mi *183 randa rights has application to the question of the voluntariness of his statements. See Commonwealth v. Pucillo, 427 Mass. 108, 111 (1998). However, the inquiries are separate. See, e.g., Commonwealth v. Parham, 390 Mass. 833, 838-39 (1984). Ultimately, the test for voluntariness of a confession is “whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act.” Commonwealth v. Selby, 420 Mass. 656, 663 (1995).
Here, there is no evidence that the police employed any undue pressure on the defendant to make the statements. See Commonwealth v. Smith, 426 Mass. 76, 81 (1997). Nor is there any evidence that, despite his history of psychological difficulties and drug abuse, defendant was incapable of making a voluntary statement to the Haverhill police. There is no suggestion that, at the time of the interrogation, defendant appeared to be suffering from severe physical or psychological problems, see Commonwealth v. Magee, 423 Mass. 381, 387-88 (1996), or that he was under the influence of drugs or alcohol. See Commonwealth v. Wolinski, 431 Mass. 228, 231 (2000). As noted, there is no per se rule against admitting the statements of individuals with mental disorders. Rodriguez, supra, 425 Mass. at 361.
Defendant suggests, however, that his statements were not voluntary because he told police during the interview that he was exhausted and wanted to go to bed. That comment does not represent an unequivocal expression of the right to remain silent, and the police were not required to treat it as such. See Commonwealth v. Sicari, 434 Mass. 732, 749 (2001) (no obligation for police to stop questioning unless defendant explicitly and unambiguously refuses to answer questions, requests an attorney or indicates he does not want to talk to police). See also Commonwealth v. Raymond, 424 Mass. 382, 395 (1997); Commonwealth v. Hussey, 410 Mass. 664, cert. den. 502 U.S. 988 (1991); Commonwealth v. Pennellatore, 392 Mass. 382 (1984). The fact that the defendant was fatigued does not render his subsequent statements involuntary. See Rodriguez, supra, 425 Mass. at 367 (statements voluntary even if defendant determined to be depressed at time of confession, because totality of circumstances indicated that defendant was cooperative and responsive, and his answers to questions were lucid, demonstrating a rational thought process); Commonwealth v. Fernette, 398 Mass. 658 (1986) (fact that defendant was hungry and tired during interrogation did not render his statements involuntary). From a consideration of the context in which the remark was made and the defendant’s subsequent willingness to continue the interview, the remark does not affect the voluntariness of the defendant’s statements. In addition, defendant twice made a valid waiver of his Miranda rights before making incriminating statements. That is “a circumstance quite relevant to a finding of voluntariness.” Id, quoting Selby, supra at 664.
The court must also consider whether the police’s intentional use of false information rendered defendant’s subsequent statements involuntary, violating his right to due process. See Edwards, supra, 420 Mass. at 673. Defendant’s initial statement to police denied any knowledge of the origin of the fire. When police questioned him about the alleged surveillance tape, defendant claimed that he had started the fire accidentally. A defendant’s statement that attempts to minimize his role in a crime suggests that the statement is voluntary because it indicates that defendant was aware that his statements to police could have adverse consequences. See Commonwealth v. Vasquez, 387 Mass. 96, 101 (1982). See also Wolinski, supra, 431 Mass. at 232 (defendant’s account attempting to deflect suspicion from himself revealed rational effort at self-preservation); Commonwealth v. Roberts, 407 Mass. 731, 733 (1990) (remaining silent about inculpatory information suggests voluntariness of statement rather than police coercion). Under the totality of the circumstances in this case, there is no evidence that any of the defendant’s statements to the police were involuntary.
CONCLUSION
From a consideration of the totality of the circumstances, I find and rule by a standard of beyond a reasonable doubt that (1) the defendant voluntarily accompanied police to the station for questioning and made a valid waiver of his Miranda rights, (2) that the subsequent use of a ruse by the police involving a false claim of a videotape of the defendant’s activities did not invalidate the waiver of defendant’s Miranda rights, and (3) that the defendant’s statements to the police were voluntary. Accordingly, the motion to suppress must be denied.
ORDER
For the foregoing reasons, it is hereby ORDERED that defendant’s motion to suppress is DENIED.

 It was not clear from the testimony as to whether the detective asked to be present or whether Whittier requested his presence.

 29-year-old Letizia Montefusco lives in Haverhill with her sister, Ann, has an associate degree in early childhood education from North Essex Community College and works as a pre-school teacher.

 Aunt Antoinetta, who lived in Springfield, raised defendant after his parents’ divorce and had been like a “Mom” to him.

 Letizia related that when defendant told her that “these gentlemen” are conducting an investigation and want to talk to me, his voice was calm, normal and “polite-like.”

 Earlier, the police had suggested that if charged the defendant could probably expect a bail to be set in the range of $500-$1000. This was not tantamount to an assurance that a confession would aid the defendant or result in a lesser charge so as to render his waiver of Miranda rights invalid or his statements involuntary. Contrast, Commonwealth v. *184 Meehan, 377 Mass. 552, 563 (1979), cert. dismissed, 445 U.S. 39 (1980).

 Even if the defendant were In custody when he was taken to the station, the police were aware that the fire had been set, that the defendant had been alone in the apartment 15 minutes before the fire was reported and that at that time defendant was angry that the apartment owner had taken his money and left without giving him cocaine. Those facts are sufficient to establish probable cause. See Commonwealth v. Williams, 422 Mass. 111, 119 n.11 (1996). Moreover, defendant was not questioned about the fire until he had received proper Miranda warnings.

 “Relevant factors include, but are not limited to, ‘promises or other inducements, conduct of the defendant, the defendant’s age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition . . . and the details of the interrogation, including the recitation of Miranda warnings.’ ” Rodriguez at 366, quoting Commonwealth v. Mandile, 397 Mass. 410, 412 (1986).