## COMMONWEALTH vs. DOMINIC WILLIAMS.

Suffolk. January 4, 1983. — April 19, 1983.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Evidence,* Admissions and confessions. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Practice, Criminal,* Capital case.

Neither the personal characteristics of a seventeen year old defendant arrested for murder, nor the circumstances in which he made a statement to police admitting his involvement in the crimes in question, required suppression of the statement as involuntarily given or made without a valid waiver of Miranda rights. [850-856]

At the trial of a murder case the judge's instructions to the jury respecting their consideration of statements made by the defendant to police were not misleading and adequately apprised the jury of the circumstances to be considered in evaluating the voluntariness of the defendant's statements. [856-857]

INDICTMENTS found and returned in the Superior Court Department on February 19, 1981.

The cases were tried before *Brogna, J.*

*Willie J. Davis* for the defendant.

*Michael J. Traft,* Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J. The defendant, Dominic Williams, was convicted by a Suffolk County jury of murder in the first degree and armed robbery. The judge sentenced the defendant to the mandatory term of life imprisonment on the murder conviction and to a concurrent term of twenty to forty years on the armed robbery conviction. The defendant appeals the convictions, challenging as error the trial judge's admission of certain statements made by the defendant to the police, and the judge's instruction to the jury on the issue of the voluntariness of the defendant's statements.

The defendant also seeks relief pursuant to G. L. c. 278, § 33E. We reject all the defendant's contentions and, accordingly, affirm the judgments.

On January 15, 1981, at approximately 8 P.M., the victim, Alton Whitaker, a twenty-two year old Roxbury resident, decided to accompany his sixteen year old friend, Morris Charley, to the Chez Vous roller skating rink. Whitaker owned a portable radio/cassette player, which he decided to take with him. After going to a sandwich shop, Whitaker and Charley boarded a bus to ride down Blue Hill Avenue to the skating rink. The bus was crowded and Whitaker and Charley sat in separate seats. During the ride, the defendant and two companions boarded the bus. Charley had seen the defendant several times at the Dudley Street subway station and recognized his face though he did not know his name. Whitaker was playing his radio on the bus and the defendant and his companions were dancing to the music.

At the intersection of Morton Street and Blue Hill Avenue, the defendant and his companions got off the bus, as did Whitaker and Charley. Whitaker and Charley walked down Rhoades Street, off Blue Hill Avenue, in the direction of the Chez Vous rink. After they had walked about ten to fifteen feet down Rhoades Street, Charley heard the defendant say, "Give it up." Charley turned and saw two guns, a .38 caliber revolver in the defendant's hand pointing at Whitaker and another gun pointed at his own back in the hand of one of the defendant's companions. Whitaker pulled out a knife and turned toward the defendant. The defendant shot Whitaker in the chest, tucked the gun away, grabbed the radio, and ran away with his two companions. Charley went to a liquor store for help and the police arrived to take the victim away in an ambulance. The victim was dead on arrival at a hospital.

Alonza Edward, nicknamed "Funny," testified that he had known the defendant all the defendant's life. He stated that on or about January 15, 1981, the defendant sold him a portable radio/cassette player. The defendant wanted $100

for the radio, but Edward ultimately bought it for $60 and a "blow of cocaine." A few days later Edward heard that a radio had been taken in a shooting. He decided to give the radio to the police and spoke with some friends to discover a way that he could accomplish this without becoming involved. After arranging for someone to contact Detective Arthur Linsky, Edward turned the radio over to him and went down to the police station to give a statement.

On January 16, 1981, Officer Paul Murphy went to the victim's house and retrieved a carton which contained a picture and serial number of the stolen radio. On January 18, after receiving information that the defendant was involved in the shooting, Murphy obtained a photograph of the defendant, included it with eleven others, and went to Charley's home. Charley identified the defendant's photograph. A warrant for the arrest of the defendant was then obtained.

Detective Linsky and another officer arrested the defendant on January 19, 1981, and the defendant was advised of his Miranda rights. The defendant said "he had nothing to say." Linsky detained the defendant and several other persons on the premises where the arrest occurred while the police obtained a search warrant. A subsequent search, pursuant to the newly-obtained warrant, yielded a .38 caliber gun in a down vest found in a room occupied by the defendant.

The defendant was transported with Linsky and two other police officers to the organized crime unit at police headquarters. Once at the organized crime unit, Linsky approached the defendant and asked him if he wanted to talk. Linsky stated that the defendant just looked at him, so he engaged the defendant in conversation about only general subjects.

One Bryan Jones was also present at the same premises where the defendant's arrest occurred. Jones, who was also a suspect in the crimes, was brought to the police station in a separate car from that of the defendant. Linsky spoke alone with Jones after he discussed general subjects with the

defendant. When Linsky spoke with Jones, the defendant was seated in the same room at the opposite end. Jones denied any involvement in the murder and told Linsky that the defendant had admitted that he shot the victim in the chest and that he sold the victim's radio. Jones asked to speak with the defendant and Linsky granted his request. Linsky stated that he could hear only Jones' part of the conversation and that Jones told the defendant that he did not want to be blamed for a murder and robbery in which he was not involved.

After speaking with Jones, the defendant called Linsky over and told him that Jones had nothing to do with the incident. Linsky then asked the defendant whether he remembered his Miranda rights and whether he wanted Linsky to readvise him of these rights. The defendant said that he understood his rights and that he did not want Linsky to readvise him of them. The defendant then admitted to Linsky that he and two others had shot the victim and that he sold the radio to "Funny Man" for $60 and "two blows of coke." Linsky allowed the defendant to use the telephone, and the defendant called a friend, Anita Carter, and told her to get the radio from "Funny Man."

On cross-examination, Linsky said he thought the defendant was about nineteen to twenty years old but later found out that he was only seventeen. Linsky further stated that he did not know the extent of the defendant's schooling.

At about 8 P.M., Linsky brought the defendant to the homicide unit to make a tape-recorded statement to Detective Sergeant Stephen Murphy. Sergeant Murphy met with the defendant and asked him if he wanted to speak about the incident. The defendant responded that he did, and Sergeant Murphy advised him of his Miranda rights. Hoping to induce the defendant to make a statement, Sergeant Murphy said he would make the defendant's cooperation known to the judge and to the district attorney.[1] Sergeant

---

[1] The defendant's subsequent cooperation was made known to the judge before trial. The Commonwealth offered to accept a plea of guilty to

Murphy, who had been a narcotics officer for five years, determined that the defendant was not under the influence of any drug, was oriented as to time and place, and understood what was being said.

After the defendant indicated that he wished to talk, Sergeant Murphy turned on the tape recorder, again informed the defendant of his rights, and asked the defendant about the incident. In response to questioning, the defendant admitted that he had followed the victim off the bus and told him to "give me the tape." When the victim pulled out a knife, the defendant shot him, took the radio, and ran up Blue Hill Avenue. At one point, the defendant said, "I don't want to say any more," and Sergeant Murphy immediately complied and stopped the interrogation. Later, the defendant asked to make a further statement and gave the names of his two companions.

At trial, the defendant moved to suppress his statements to Detective Linsky and to Sergeant Murphy. After conducting a voir dire, the judge found that the statements were made voluntarily, and that the defendant understood his rights and knowingly and intelligently waived them. He also found that the defendant "knew that he didn't have to talk with the officers, [and] he knew that he could stop whenever he wanted, . . . as he in fact did." The judge denied the defendant's motion. The judge did suggest, however, that the Commonwealth not offer the portion of the tape-recorded statement after the defendant asked to cut off questioning. The Commonwealth complied with this suggestion, but the remainder of the tape was played to the jury.

1. The defendant first argues that the judge erred in admitting in evidence his statements to the police because there was no valid waiver of his Miranda rights and because his

murder in the second degree before trial and kept the offer open until after all the Commonwealth's evidence had been presented at trial. The defendant, however, declined to plead guilty.

statements were not made voluntarily. We disagree.[2] In reviewing a judge's determination that a voluntary waiver was made, we will not disturb the judge's subsidiary findings if they are warranted by the evidence and we will accord substantial deference to the judge's ultimate findings. *Commonwealth* v. *Tavares,* 385 Mass. 140, 144-145 (1982). To fulfil our appellate function, however, we make an independent determination about the correctness of the judge's application of constitutional principles to the facts as found. See *Brewer* v. *Williams,* 430 U.S. 387, 403 (1977); *Tavares, supra* at 145. We apply this same standard of review to the judge's findings on the issue of the voluntariness of statements made by the defendant. See *Commonwealth* v. *Wilborne,* 382 Mass. 241, 251-252 (1981).

As to the issue of the validity of the defendant's waiver of his Miranda rights, we perceive no error in the judge's conclusion. It is well settled that a minor may waive his constitutional rights and make an incriminating statement to the police that is admissible against him. *Tavares, supra* at 146. *Wilborne, supra* at 253. *Commonwealth* v. *Daniels,* 366 Mass. 601, 605-606 (1975), and cases cited. The admissibility of statements made by a minor "must be determined by an examination of 'the totality of all the surround-

---

[2] It is clear that voluntariness of a confession and waiver of Miranda rights are different issues. E.g., *Commonwealth* v. *Tavares,* 385 Mass. 140, 145 (1982), quoting *Coyote* v. *United States,* 380 F.2d 305, 309-310 (10th Cir.), cert. denied, 389 U.S. 992 (1967) ("[A]n incriminating statement may also be inadmissible and insubmissible because not factually shown to have been freely and voluntarily given, even though the requirements of *Miranda* have been fully met"). In *Tavares,* we concluded that the Commonwealth must prove beyond a reasonable doubt the voluntariness of a statement by a defendant to law enforcement officers or their agents. *Tavares, supra* at 152. In *Commonwealth* v. *Day,* 387 Mass. 915, 921 (1983), we held that the Commonwealth must also prove a knowing and intelligent waiver of Miranda rights beyond a reasonable doubt. That standard is not applicable here because it is to be applied only to decisions made on motions to suppress after the date of the *Day* opinion. *Id.* at 921 n.10. We note, however, that the judge's conclusion that the waiver was knowing and voluntary "appear[s] from the record with unmistakable clarity." *Tavares, supra,* quoting *Sims* v. *Georgia,* 385 U.S. 538, 544 (1967).

ing circumstances — both the characteristics of the accused and the details of the interrogation.'" *Daniels, supra* at 606, quoting *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 226 (1973). Accord *Tavares, supra.* We note, however, that, where a defendant is a minor or is mentally impaired, certain circumstances and techniques of custodial interrogation may not be constitutionally acceptable when applied to such a defendant even though they may be tolerable as applied to a normal adult. *Commonwealth* v. *Garcia*, 379 Mass. 422, 430 n.4 (1980). *Commonwealth* v. *Daniels*, 366 Mass. 601, 606 (1975).

In this case, the defendant, who was seventeen at the time of the interrogation, did not demonstrate any factor other than his age which might interfere with his ability to make a knowing, voluntary, and intelligent waiver of his Miranda rights. See *Garcia, supra* at 430. Contrast *Commonwealth* v. *White*, 374 Mass. 132 (1977), aff'd, 439 U.S. 280 (1978) (intoxication); *Commonwealth* v. *Hosey*, 368 Mass. 571 (1975) (intoxication and irrational behavior); *Daniels, supra* at 608 (mental retardation). Indeed, during his interrogation of the defendant, Sergeant Murphy specifically observed that the defendant did not appear to be under the influence of drugs or alcohol. Further, even with regard to his age, the defendant did not appear to be particularly immature for a seventeen year old youth. Rather, Detective Linsky's first impression as to the defendant's age was that he was nineteen or twenty years old. Hence, it seems that the defendant was mature for his age. Contrast *Commonwealth* v. *Cain*, 361 Mass. 224, 229 n.3 (1972) (frightened and confused fifteen year old), and cases cited. The defendant emphasizes that he had no relatives located in this State, There is no indication from the record, however, that the absence of relatives in this State interfered with the defendant's ability to make a voluntary and knowing waiver or that the police attempted to take unfair advantage of this fact. Thus, we perceive no particular personal characteristics of the defendant that would lead us to invalidate his waiver of his Miranda rights.

Furthermore, in examining the details of the interrogations of the defendant, we find no circumstances that in any way vitiate the validity of the waiver. The police may not fairly be said to have engaged in any unfair techniques or tactics. See *Commonwealth* v. *Silva, ante* 495, 503 (1983), and cases cited. The defendant emphasizes that much of the substance of the tape-recorded statement consists of short responses by the defendant to detailed and often leading police questions. After examining the record as a whole, including questioning of the defendant by his own attorney, we conclude that the form of the questions appears to be the result of the defendant's sometimes limited ability to articulate his sentiments and not the result of unfair police interrogation.

The defendant further challenges the validity of the waiver on the ground that, when he indicated to Linsky that he did not desire to talk about the incident,[3] the police were required to cease the interrogation and to honor scrupulously the defendant's decision. See *Michigan* v. *Mosley,* 423 U.S. 96, 103-104 (1975); *Miranda* v. *Arizona,* 384 U.S. 436, 473-474 (1966). He contends that Linsky did not honor scrupulously his choice, and that his statements, therefore, should be suppressed.[4] We note initially that Linsky himself did cease all questioning of the defendant with regard to the incident after the defendant indicated that he desired to remain silent. The defendant does not dispute

---

[3] He asserts that he twice invoked his right to remain silent — once in his apartment after his arrest when he said he had nothing to say, and once at the police station when Linsky asked the defendant whether he wanted to talk and the defendant merely looked at him. See *Michigan* v. *Mosley,* 423 U.S. 96, 100 (1975), quoting *Miranda* v. *Arizona,* 384 U.S. 436, 473-474 (1966) ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease").

[4] The defendant argues that his tape-recorded statement to Sergeant Murphy should be suppressed because it was tainted by the initial illegality of his statement to Linsky. See, e.g., *Commonwealth* v. *Watkins,* 375 Mass. 472, 480-482 (1978). Since we find no illegality in the defendant's initial statement to Linsky, however, we need not reach this argument.

this fact. Rather, he contends that Linsky's action in bringing Jones into the same room where the defendant was located was calculated to influence the defendant to waive his rights and to make a statement. We conclude, however, that Linsky did not fail to honor scrupulously the defendant's decision to remain silent.

The inquiry in examining whether the authorities acted unfairly after a suspect invoked his right to remain silent is "whether the authorities used any words or actions, other than those normally attendant to arrest and custody, that they should have known were reasonably likely to elicit an incriminatory response from the suspect." *Commonwealth v. Brant,* 380 Mass. 876, 883 (1980), citing *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980). In this case, Linsky's action in questioning Jones in the presence of the defendant may not be characterized as an impermissible attempt to vitiate the defendant's exercise of his Miranda rights. There is no evidence that the interrogation of Jones was merely a ruse. It appears that, when Jones was brought to the station, the police did not know who the defendant's confederates were. Jones was brought to the police station because he too was a suspect in the crimes. Indeed, Linsky testified that, when he questioned Jones, Jones was under arrest.[5] It appears further that the defendant and Jones were placed in the organized crime unit together solely because Linsky was in charge of the arrest and because Linsky was assigned to the organized crime unit. Moreover, Linsky testified that the defendant was seated twenty-five to thirty feet away from him and Jones. Linsky further stated that he did not think that the defendant could hear his conversation with Jones. We also note that there is

[5] The defendant contends that, when Linsky interrogated Jones, he already knew that Jones had given a statement to Sergeant Murphy denying any involvement in the shooting and implicating the defendant. Thus, the defendant urges there was no reason to requestion Jones in the defendant's presence other than to undermine the defendant's exercise of his right to remain silent. We point out, however, that the transcripts reveal that Jones was interviewed by Sergeant Murphy *after* he spoke with Linsky.

nothing in the evidence of this case to support the conclusion that Linsky somehow prompted or persuaded Jones to speak with the defendant. Rather, Jones requested to speak with the defendant on his own initiative and not at the prompting or suggestion of Linsky. It was Jones, and not Linsky, who sought to convince the defendant to clarify to the police that Jones was not involved in the crimes. While the defendant, in waiving his rights, may have been motivated to clear Jones, it appears from the record of this case that it was Jones' actions and influence alone, and not unfair police tactics, that prompted the defendant to make a statement. Contrast *Commonwealth* v. *Brant*, 380 Mass. 876, 882-883 (1980) (holding that right to remain silent not honored scrupulously where authorities, with hope and expectation of inducing waiver, told defendant that codefendant had already made statement to police and where defendant, after receiving this information, spoke with codefendant and then made statement to authorities).

The defendant's final argument with regard to the validity of his waiver of Miranda rights focuses on Sergeant Murphy's promise to make known to the district attorney's office and to the judge the defendant's cooperation in making a statement. The defendant contends that, although not specifically promised anything, he was subject, nevertheless, to psychological coercion. We disagree. In *Commonwealth* v. *Meehan*, 377 Mass. 552, 564 (1979), cert. dismissed, 445 U.S. 39 (1980), we stated that "[a]n officer may . . . indicate that the person's cooperation would be brought to the attention of the public officials or others involved, or may state in general terms that cooperation has been considered favorably by the courts in the past" (footnotes omitted). Hence, Sergeant Murphy's statement was not improper. What is prohibited is not a general statement about the value of cooperation but a promise that cooperation by the defendant will aid the defense or result in a lesser sentence being imposed. *Id.*

In addition to arguing that he did not make a valid waiver of his Miranda rights, the defendant urges that we

suppress his statements to Linsky and Sergeant Murphy on the ground that they were not voluntarily given. We have stated that "[t]here is no easy acid test for voluntariness" but that "[i]n each case, the court must assess the totality of relevant circumstances to ensure that the defendant's confession was a free and voluntary act and was not a product of inquisitorial activity which had overborne his will." *Commonwealth* v. *Mahnke*, 368 Mass. 662, 680 (1975), cert. denied, 425 U.S. 959 (1976). After reviewing the record in this case, as well as our decisions on the issue of voluntariness, we conclude, for largely the same reasons as posited in our discussion of the validity of the waiver, that the trial judge properly determined that the Commonwealth satisfied its burden of demonstrating beyond a reasonable doubt that the defendant's statements were made voluntarily. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 152 (1982).

2. We also reject the defendant's assertion that the judge's instruction to the jury on the issue of the voluntariness of the defendant's statements was erroneous. Under our "humane practice," even if a judge determines that a defendant's incriminating statements were made voluntarily and, therefore, are admissible, if voluntariness "is made a live issue at trial," *Commonwealth* v. *Alicea*, 376 Mass. 506, 523 (1978), the judge must "instruct the jury that the Commonwealth has the burden of proving beyond a reasonable doubt that the statement[s were] voluntary and that the jurors must disregard the statement[s] unless the Commonwealth has met its burden." *Commonwealth* v. *Vazquez*, 387 Mass. 96, 102 (1982), quoting *Tavares, supra.* The judge in this case did give a substantial instruction on the issue of voluntariness.[6] The defendant contends, how-

---

[6] The judge's instruction reads as follows: "[I]t is your function, one of your functions to determine whether or not [the defendant's incriminating] statement was given voluntarily and intelligently, and the Commonwealth has to convince you — and, incidentally, anytime during my charge I use the words 'must convince you,' I mean beyond a reasonable doubt as I explained that term. The Commonwealth has to convince you before you may use it at all in your deliberations that that statement was given voluntarily, freely and intelligently. Now this does

ever, that the judge erred because he did not instruct in the language requested by the defendant. It is clear that a judge need not instruct in the precise language requested by defense counsel. E.g., *Commonwealth* v. *Chasson*, 383 Mass. 183, 188 (1981). Further, although the defendant's requested charge was more specific and detailed, a trial judge is under no duty to make specific reference to facts which the defendant desires emphasized so long as the instructions are adequate. *Id. Commonwealth* v. *Harris*, 376 Mass. 201, 208 (1978). *Commonwealth* v. *Edmonds*, 365 Mass. 496, 506 (1974). Reading the judge's instructions as a whole, we conclude that they were not misleading and that they adequately apprised the jury of the circumstances to be considered in evaluating the voluntariness of the defendant's statements. See *Chasson*, *supra*, and cases cited.

3. We have examined the record as we are required to do under G. L. c. 278, § 33E. Although the defendant was seventeen years old at the time of the murder, there are no

---

not mean that the Commonwealth has to convince you that they didn't beat the defendant over the head with a rubber hose. That's not the test. The test is that you must be convinced that when he made that statement he was not under any threat or compulsion from the police and that he knew his rights. His rights, as you have heard them, that he did not have to say anything that he didn't want to, that he could have had a lawyer there if he wanted one, that he could have stopped at any time, that he knew these and voluntarily gave them up and made his statement, whatever it was, without any coercion, threats or deprivation of his rights by the police.

"Now there has been some mention about that before he made the statement, after he said that he didn't want to say anything and after he talked to this fellow Jones he changed his mind. Now remember, I said that it has to be the police who use undue pressure. Unless you find that Jones was the instigator or the police instigated Jones to tell him whatever they talked about and that brought on the confession, that is not the police responsibility. If Jones himself wanted to talk to him as a result of whatever was said, then he gave whatever statement he did, that is not an involuntary statement. Now, I want you to clearly understand that whether or not you consider that statement was voluntary or not, even if you consider it was not and cannot use that in your deliberations, you still may use any other evidence which you believe."

mitigating factors in the facts of this case which warrant our granting relief under our extraordinary powers found in G. L. c. 278, § 33E. See *Commonwealth* v. *Almon,* 387 Mass. 599, 604-608 (1982).

*Judgments affirmed.*