COMMONWEALTH *vs.* JONATHAN ASHLEY.

No. 10-P-1593.

Bristol. September 12, 2012. - November 15, 2012.

Present: GREEN, FECTEAU, & MILKEY, JJ.

*Homicide. Practice, Criminal,* Motion to suppress, Waiver, Voluntariness of statement, Admissions and confessions, Cross-examination by prosecutor, Argument by prosecutor. *Constitutional Law,* Waiver of constitutional rights, Voluntariness of statement, Admissions and confessions. *Evidence,* Voluntariness of statement, Admissions and confessions, Wiretap, Cross-examination, Argument by prosecutor.

A Superior Court judge properly denied in part a criminal defendant's pretrial motion to suppress his statement to the police, where the defendant gave the statement after voluntarily, knowingly, and intelligently waiving his Miranda rights, in that, although two so-called "rights" on the Miranda waiver form constituted misstatements, they did not dilute the impact and effectiveness of the Miranda rights; and in that the defendant had no impairments to understanding and was aware of the Miranda rights from previous encounters with the police [753-755]; where, in the totality of the circumstances, the defendant's statements were voluntary, in that he understood his predicament, the unsuppressed portion of the interview was not coercive, and he was not ill, fatigued, or intoxicated [755-758]; and where the defendant's conclusory argument that the police intentionally failed to advise him of his right to use the telephone, under G. L. c. 276, § 33A, lacked merit [758-759]; moreover, the judge properly concluded that the recording of the defendant's interrogation did not violate G. L. c. 272, § 99, where the recording did not amount to surreptitious eavesdropping [760-762].

At a criminal trial, no prejudice arose from questions asked by the prosecutor in his cross-examination of the defendant referring to the defendant's prior bad acts, where the judge gave the jury a proper and complete final instruction as to the proper but limited consideration of prior convictions. [762-763]

At a criminal trial, the prosecutor's remarks during his closing argument referring to certain statements the defendant made to police about the appearance and actions of the victim and his companions were not overly prejudicial in the circumstances. [763-764]

INDICTMENT found and returned in the Superior Court Department on December 1, 2006.

Pretrial motions to suppress evidence were heard by *Frances A. McIntyre*, J., and the case was tried before *John P. Connor, Jr.*, J.

*David H. Mirsky* for the defendant.

*Austin Simko* (*Tara L. Blackman*, Assistant District Attorney, with him) for the Commonwealth.

FECTEAU, J. The defendant appeals from a conviction of murder in the second degree. He contends that the motion judge erred by not suppressing, in its entirety, his statement to police during a custodial interrogation, claiming violations of his rights under the Fifth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. Specifically, he complains that the Miranda warnings that he was given were improper, that his waiver of his rights was neither knowing nor voluntary, and that his statements were otherwise involuntary. In addition, he contends that suppression was required due to violations of his right to use the telephone and of the wiretapping statute. Lastly, he contends that certain questions asked of him by the prosecutor in cross-examination and statements made in the prosecutor's final argument were improper. We affirm.

*Background.* A. *The offense.* The jury could have found the following facts from evidence admitted during the Commonwealth's case-in-chief. On the evening of September 14, 2006, the victim, Esteban Tum Chach, a Guatemalan male who stood five feet and one inch tall, and two Guatemalan friends, Carlos and Juan, were walking down North Front Street in New Bedford, headed toward 12 Bullard Street, where both Carlos and Juan lived. The victim was wearing a hat and had a cellular telephone clipped to his right pocket. As the three approached the corner of North Front Street and Bullard Street, they encountered the defendant, who was standing outside 352 North Front Street. Without apparent provocation, the defendant started an altercation with these men with actions that included taking or knocking off the victim's hat; asking for money; saying, "Give me five dollars for your hat"; and taking his cellular telephone. An argument ensued that evolved into a fistfight. At this point, the defendant drew a knife from his pocket and

slashed at the victim, fatally stabbing him in his right side.[1] The fight lasted only a couple of minutes; by the time it was finished, the victim was bleeding heavily. After he stabbed the victim, the defendant ran inside 352 North Front Street. About four or five people were standing around the defendant and the victim during the fight, one of whom was Joanne Renaud. She saw the defendant start an altercation with the three men, grab the victim's hat and demand money for it, hit the victim, and then stab him when he tried to fight back; she also saw the defendant run into 352 North Front Street.

Meanwhile, Carlos telephoned the police at the victim's request, and after the fight was finished, Renaud also telephoned 911; Carlos remained at the scene, as did Renaud and her roommate, who both tried to help the victim. Police and paramedics arrived shortly. The victim later died from this injury.

The next day, parole Officer Robert Mello, who knew the defendant, was asked to assist in locating him. Between 4:00 and 6:00 P.M., Mello went to 352 North Front Street and entered the building through the rear. He located the defendant, crouched down in an attic area on the opposite side of the attic from where Mello entered. At that point, police officers assisted in taking the defendant into custody.

The defendant was brought to the New Bedford police station, where he first was interviewed by State police Trooper William Lennon and New Bedford police Detective Kurt Dreher, and later by New Bedford police Detective James Estrella. An audio-visual recording of portions of the interview was admitted in evidence; the recording ran approximately one hour and eight minutes.[2] The defendant appeared to have a small abrasion on his cheek or near his hairline, and an injury on his leg, which he said that he had sustained a couple of days earlier.

---

[1]The theory of the defense, supported by the defendant's testimony, was mutual combat and self-defense. In his testimony, the defendant did not deny having drawn a knife and stabbing the victim, but testified that the first physical contact was when the victim punched him, and that Carlos had drawn a knife before the defendant had done so. Given this testimony, the judge gave instructions to the jury on self-defense and voluntary manslaughter.

[2]The motion judge viewed the entire (two and one-half hour) recording prior to issuing her comprehensive and thoughtful findings of fact and rulings of law on the defendant's motion to suppress. Prior to trial, some portions of the recording were edited by agreement.

B. *The interrogation.* At the beginning of the interview, Trooper Lennon orally advised the defendant of the Miranda rights by reading from a New Bedford police form;[3] the defendant stated that he understood them, and signed the waiver section indicating that he was willing to speak.[4] Lennon told the defendant that they wanted to hear his "side of the story" about what happened on the night of the incident. During the interview, the

---

[3]This form, entitled "WARNING OF RIGHTS AND WAIVER OF RIGHTS," states:

> "You must understand your rights before we ask you any questions.
>
> "1. You have the right to remain silent.
>
> "2. Anything you say can be used against you in a court of law.
>
> "3. You have the right to consult with any attorney before making any statement or answering any questions and you may have him present with you while you are being questioned, if you wish.
>
> "4. If you cannot afford to hire an attorney, one will be provided and will be appointed to represent you before any questioning, if you wish one.
>
> "5. If you decide to answer any questions now with or without an attorney you still have the right to stop the questioning at any time for the purpose of consulting an attorney.
>
> "6. However, you may waive the right to advice of counsel and the right to remain silent, and you may answer questions or make a statement without consulting an attorney, if you so desire.
>
> "7. Do you understand each of these rights that have been explained to you?
>
> "8. Having these rights in mind, do you wish to talk to us now?"

The second heading, at the middle of the page, states, "WAIVER OF RIGHTS." Below that heading, the form states:

> "I hereby voluntarily and intentionally waive my rights and I am willing to make a statement and answer questions. I do not want a lawyer. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

The form then has space for the signatures of the interviewee and two witnesses, the date, and the time.

[4]Detective Dreher, also in the interview room, stated the following: "Okay, that form we just read to you? You can just read it as well. Then we'll have you sign it, I'll sign it, he'll sign it. You know what I mean?" The defendant asked for his handcuffs to be loosened so that he could sign the form.

defendant acknowledged that he had gotten into a fight the previous night with three men who he referred to as "[f]ucking three Guatemalans." He said that he tried to take one of their hats, and then two of the men started "swinging" at him and he fought back. He admitted that during the fight he grabbed the victim's cellular telephone. He claimed that one of the "Guatemalans," whom he later learned was named Carlos, pulled a knife out of his pocket and that he (the defendant) was trying to defend himself against them. At first the defendant denied that he ever used a knife himself, but later during the interview, he implied the use of a knife: "Maybe I thought that if I pulled it out they would just fucking back the fuck up, you know what I'm saying." Then, when asked where the knife was, the defendant said, "I got rid of that shit," agreeing that he had gotten rid of it by a bridge in a park. Later, however, likely realizing the position in which he had placed himself, coupled with his apparent realization that police had not located and identified the knife used in the stabbing, he reverted to his earlier denial of the possession and the use of a knife. He admitted that as soon as he saw the victim bleeding, he ran into 352 North Front Street and hid, but first had thrown the telephone and the white shirt he was wearing "out back" upon reaching the second floor.

The judge ordered suppression of the defendant's statement after 7:38 P.M., finding that the defendant's will had been overborne by Detective Estrella: "Estrella continued the 'two possibilities' theme set by Dreher but told [the defendant] that he had only two choices . . . . Specifically and repeatedly, Estrella told the defendant that he only had two choices — premeditated murder or self-defense . . . and that if he was going to choose self-defense, then he needed to tell — right then — what happened. . . . This Court finds that [Estrella's] repeated misrepresentation of the defendant's rights overshadowed [his] occasional, off-hand corrections of his misrepresentation."[5] Additional facts appear as may be necessary for the following discussion.

---

[5]The judge noted the following statements by Estrella as examples: "You decide what you want to tell me. When it goes to trial it's all going to be down to what you tell me today. . . . You have to tell me something. . . . [T]here ain't another day." When the defendant asked, "Why now [do I have to speak]?" Estrella answered, "We leave here — this is it . . . . This is your

*Discussion.* A. *Miranda rights.* The defendant first complains that the Commonwealth failed to prove an intelligent and voluntary waiver of his Miranda rights. Specifically, he contends that the Miranda rights form used by the police, apparently significantly unchanged from the one previously criticized in *Commonwealth* v. *Novo,* 442 Mass. 262, 271-272 (2004), *S.C.,* 449 Mass. 84 (2007), continued to contain two significant errors in the fifth and sixth statements of so-called "rights," which rendered his waiver of rights unintelligent and involuntary such that his motion to suppress should have been allowed in full.

The United States and Massachusetts Constitutions protect criminal defendants against the use of their involuntary statements as evidence against them. *Miranda* v. *Arizona,* 384 U.S. 436, 467-479 (1966). *Commonwealth* v. *Murray,* 359 Mass. 541, 545-546 (1971). The analysis used in reviewing a defendant's motion to suppress pretrial statements is twofold. First, the judge must decide whether Miranda warnings were required in the circumstances, that is, whether the defendant was subject to custodial interrogation. See *Miranda, supra.* Second, if the warnings were necessary, the judge must consider three factors: (1) whether the warnings were valid; (2) whether the defendant made a voluntary, knowing, and intelligent waiver of the Miranda rights; and (3) whether the defendant made the statements voluntarily without being intimidated or coerced. See *Commonwealth* v. *Tavares,* 385 Mass. 140, 145, cert. denied, 457 U.S. 1137 (1982); *Commonwealth* v. *Williams,* 388 Mass. 846, 850-856 (1983). Compare *Commonwealth* v. *Koney,* 421 Mass. 295, 304 (1995) (despite defendant's intoxication, "statements were the 'product of a rational mind' "). It is undisputed that the defendant was under arrest and in custody at the time of this interrogation, and thus entitled to the protections of *Miranda, supra.*

In order for any post-Miranda statements to be admissible, therefore, the judge must find that the defendant waived his rights voluntarily, knowingly, and intelligently, and that the

chance to help yourself out but you have to let us know . . . . Tell me." When Estrella stated many times, "I got to put it down on paper," the judge found that it intentionally created the impression that the interrogation would not be over until Estrella got it "down on paper."

defendant made the statements as a result of a voluntary decision and not as the product of intimidation or coercion such that his will was overborne. See *Commonwealth* v. *Mahnke*, 368 Mass. 662, 680 (1975), cert. denied, 425 U.S. 959 (1976). See also *Tavares, supra.* The Commonwealth bears the burden of proving, beyond a reasonable doubt, the voluntariness of both the waiver and the statements. *Commonwealth* v. *Day*, 387 Mass. 915, 920-921 (1983). *Commonwealth* v. *Smith*, 412 Mass. 823, 836-837 (1992). *Commonwealth* v. *Berg*, 37 Mass. App. Ct. 200, 203-204 (1994).

The motion judge concluded that since the fifth so-called "right" was not required, the form's misstatement was harmless, deeming the claim of error forestalled by the holding in *Novo.* There the court observed that the giving of a fifth "right" by police, namely, the right to stop answering questions at any time even if an accused has answered some questions, is not a core Miranda right of which the police must apprise the defendant. *Novo*, 442 Mass. at 271, citing *Commonwealth* v. *Silanskas*, 433 Mass. 678, 688 n.11 (2001). Here, the judge found that the fact that the fifth "right" was given, and that it potentially conveyed the misapprehension that the only reason a defendant could stop answering questions was to consult with an attorney, did not impact the essential rights that accurately were given, or the initial waiver of those rights by the defendant. While the Commonwealth conceded that the form used here is the same as that criticized in *Novo*, we conclude, as did the *Novo* court, that the judge properly discerned that this misstatement did not negatively affect, neutralize, or otherwise invalidate the statement of required rights or the defendant's waiver thereof.[6] At the same time, however, as suggested by the *Novo* court, the motion judge indicated that she would consider this misstatement within her analysis of the over-all voluntariness of the defendant's statement. See *ibid.*

The sixth so-called "right" on the waiver form states:

---

[6]We fail to perceive any reason that would have justified the continued use of this form by the New Bedford police department following issuance of the decision in *Novo.* By letter filed pursuant to Mass.R.A.P. 16(l), as amended, 386 Mass. 1247 (1982), following oral argument in this matter, the Commonwealth advised us that the department no longer uses the form.

"However, you may waive the right to advice of counsel and the right to remain silent, and you may answer questions or make a statement without consulting an attorney, if you so desire." The motion judge ruled that this misstatement did not invalidate the "four prerequisite Miranda warnings" which were given; moreover, the judge concluded that this recitation did not invite the defendant to speak with police in the absence of a valid recitation of his right to remain silent and that any statement he made could be held against him, contrasting the facts of this case with those of *Commonwealth* v. *Ayala*, 29 Mass. App. Ct. 592, 595-597 (1990). While it is expressed as a "right," the actual language of the statement is that of waiver, summarizing the effect of the form's subsequent waiver section. To the extent that the defendant complains that the inclusion of the fifth and sixth "rights" dilute the impact and effectiveness of the core Miranda rights, the judge concluded that it did not, and we have not been persuaded otherwise.

Following the hearing, and after viewing the recorded interview of the defendant, the motion judge concluded that the defendant voluntarily waived his Miranda rights, having received advisement both orally and in writing and, thereafter, having signed the waiver section of the form. The judge credited testimony to the effect that the defendant was under no impairments to understanding, had extensive experience in the criminal justice system, and was aware of his Miranda rights from other police encounters including one earlier that same day. The judge's findings have not been shown to be clearly erroneous, nor do we discern a basis to disturb her conclusion of law.

B. *Voluntariness.* The motion judge concluded that from the beginning of the interrogation to 7:38 P.M., the defendant's statements were voluntary, while acknowledging that the first two officers conducting the interrogation were "persistent and unwavering in asking the defendant to explain his state of mind at the time of the altercation and of the location of the knife." She found, however, that when Detective Estrella took over the questioning, the tenor of the interrogation made a significant turn, the defendant's will was overborne, and his statements thereafter were involuntary. The defendant contends that the

entire interrogation was coercive and his statements, in their entirety, should have been suppressed.[7] We disagree.

There is no bright-line test for voluntariness. *Commonwealth v. Fernette,* 398 Mass. 658, 662 (1986). To determine whether a defendant made his statement voluntarily, a judge examines whether "in light of the totality of the circumstances . . . the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act." *Commonwealth v. Hilton,* 450 Mass. 173, 177 (2007), quoting from *Commonwealth v. Selby,* 420 Mass. 656, 663 (1995). The judge must determine whether the defendant made the statements as a result of a voluntary decision and not as the product of coercion. *Mahnke,* 368 Mass. at 680. See *Tavares,* 385 Mass. at 145.

"A statement is voluntary if it is the product of a 'rational intellect' and a 'free will.' " *Selby, supra* at 662, quoting from *Commonwealth v. Davis,* 403 Mass. 575, 581 (1988), *S.C.,* 410 Mass. 680 (1991). A determination of voluntariness must be made after the judge's consideration of the totality of the circumstances. *Tavares, supra* at 146. *Berg,* 37 Mass. App. Ct. at 203-204. Using the totality of the circumstances test, we consider all of the relevant circumstances surrounding the statement and the individual characteristics of the defendant. *Commonwealth v. Parker,* 402 Mass. 333, 340 (1988), *S.C.,* 412 Mass. 353 (1992), *S.C.,* 420 Mass. 242 (1995). "Relevant factors include, but are not limited to, the 'conduct of the defendant, the defendant's age, education, intelligence and emotional stability, . . . physical and mental condition, . . . and the details of the interrogation, including the recitation of Miranda warnings.' " *Hilton, supra,* quoting from *Commonwealth v. Mandile,* 397 Mass. 410, 413 (1986), *S.C.,* 403 Mass. 93 (1988).

Here, the record does not support the defendant's claim of involuntariness prior to the point at which the motion judge ordered suppression. Rather, the evidence demonstrates that the judge's careful and discerning examination of the interrogation was proper, and establishes ample support for her conclusion that the defendant's statements prior to this point were the product of his free will and rational mind. See *ibid.* There was

---

[7]The Commonwealth did not challenge the judge's suppression of evidence obtained as a result of the interrogation that followed the 7:38 P.M. mark.

no suggestion or appearance that the defendant was unfamiliar with the English language or laboring under any physical or mental disability, nor was there evidence of insobriety, immaturity, or lack of emotional stability. See *Commonwealth* v. *LeBeau*, 451 Mass. 244, 255-256 (2008). See also *Commonwealth* v. *Auclair*, 444 Mass. 348, 354-355 (2005). Well before the involvement of Detective Estrella, and early in the interview, the defendant admitted his interaction with the victim and his two companions. While the defendant first denied possession and use of a knife, as Lennon and Dreher pressed the apparent omissions in the defendant's recount compared with witness statements, the defendant gradually made concessions, such as having probably instigated the altercation by taking the victim's hat and cellular telephone,[8] which, at this point, he said escalated the altercation when one of the others pulled a knife. The defendant obviously was aware of his predicament and where his self-interest lay, as he consistently denied the stabbing during this unsuppressed segment; moreover, for most of the first hour, he denied having a knife or having used it, except for isolated admissions consistent with defending himself against three angry men (one of whom pulled out a knife thereafter), including that the defendant may have shown a knife to get the three men to "back off," and that he had gotten rid of the knife by a park bridge.

The judge found that the first two questioners were persistent but not coercive; these are not equivalent terms. Similarly, that the judge found the questioners to be unwavering does not indicate coerciveness but, rather, an unwillingness to accept the defendant's version of events at face value without requesting candid reappraisal and testing his statements by logical reasoning — especially upon the defendant's gradual filling of gaps in his version of events and admitted omissions of certain details. While the first two officers repeatedly told him that they wanted his "side of the story," and on one occasion presented a two-choice question whether the killing was intentional or in self-defense, the motion judge found this to be a tactic of using leading questions rather than a forced choice. The judge also

---

[8]The defendant stated: "I didn't really want to tell you that I was kind of doing the instigating and shit."

found that, unlike Detective Estrella, the tone employed by the two officers during the unsuppressed segment was neither coercive nor confrontational, and the defendant remained willing to answer their questions. Additionally, although the two officers stated that the district attorney would learn of the defendant's lack of sobriety, there were no promises, suggestions of leniency, or other inducements. Contrast *Commonwealth* v. *Magee*, 423 Mass. 381, 387 (1996). Further examination of the record reveals no factual misstatements that were claimed to have been made to the defendant, nor were other methods of trickery or deception employed to gain admissions. Contrast *Commonwealth* v. *Forde*, 392 Mass. 453, 455 (1984) (no involuntariness when police implied that defendant's fingerprints had been found on corpse when they had not); *Selby*, 420 Mass. at 664-665 (no involuntariness when police asked defendant how they could have found his handprint and fingerprint at scene and on shell casings when, in fact, they had not). Both *Forde* and *Selby* resulted in decisions in which orders denying suppression were affirmed on appeal, essentially on the basis that misinformation, although relevant, was not conclusive in consideration of the totality of the circumstances in question.

In the totality of the circumstances here, the defendant has not demonstrated any error in the motion judge's careful analysis of the voluntariness of his statements. She found that the defendant understood his predicament, that the unsuppressed portion of the interview was not coercive, and that the defendant was not suffering from any illness or fatigue nor was he under the influence of any intoxicating substance. There is no basis to disturb the judge's finding that the statements the defendant gave to the two officers prior to the point she determined otherwise were voluntary.

C. *Telephone rights under G. L. c. 276, § 33A.*[9] The defend-

---

[9]That statute provides, as amended by St. 1963, c. 212, that "[t]he police official in charge of the station . . . shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney." The police are to inform the arrested person of the right "forthwith upon his arrival" at the station, and "such [telephone] use shall be permitted within one hour thereafter."

ant contends alternatively that all of the statements he made during this interrogation must be suppressed on the ground that the police failed to advise him of his statutory right to use the telephone. It is undisputed that this right was not recited orally to the defendant, and additionally, the Commonwealth concedes that it was not shown to him in writing for him to read.[10] When asked during the suppression hearing why this was not done, Trooper Lennon said he had "no excuse." The judge found that the failure to so advise the defendant was unintentional, a finding the defendant claims is plainly wrong, relying upon the totality of the circumstances of the interrogation that he alleges demonstrates a wilful plan to violate his rights.

The legislative purpose of G. L. c. 276, § 33A, as appearing in St. 1960, c. 269, is stated plainly in its text: to allow a person in custody the ability "to communicate with his family or friends, or to arrange for release on bail, or to engage the services of any attorney." Noting that the statute did not prescribe any penalty for a violation, the court "grafted an exclusionary rule to it." *Commonwealth* v. *Alicea*, 428 Mass. 711, 716 (1999), citing *Commonwealth* v. *Jones*, 362 Mass. 497, 502 (1972). "If intentional police misconduct deprives a defendant of the statutory right, suppression is required." *Ibid.*, citing *Commonwealth* v. *Johnson*, 422 Mass. 420, 429 (1996).

The defendant conclusorily suggests that the interrogation, viewed in its entirety, demonstrates a plan by police to intentionally deprive the defendant of all of his rights, but he fails to show how the motion judge's finding of a lack of intentional deprivation regarding telephone use was plainly wrong. We fail to discern clear error in the judge's rejection of the intentional motives attributed to the police by the defendant. Consequently, we view this claim as without merit.

---

[10]A third section of the "WARNING OF RIGHTS AND WAIVER OF RIGHTS" form states the following:

"ADVISED OF THE USE OF THE TELEPHONE

"General Laws Chapter 276 Section 33A States that you have the right (within the hour) to make a telephone call at your own expense to communicate with your family, or friends, or to arrange for a release on bail, or to engage the services of any attorney."

D. *Wiretapping statute, G. L. c. 272, § 99.*[11] The defendant complains that the recording of his interrogation by police was in violation of the wiretapping statute because he neither knew of nor consented to it.[12] The judge disagreed, relying in part on *Commonwealth* v. *Gordon*, 422 Mass. 816, 832-833 (1996), and concluding that the statute was not violated because the recording was not a secret recording of a conversation intended by the defendant as private.

As noted by the motion judge, for the purpose of determining whether the recording of the defendant's custodial interrogation by police contravened the wiretapping statute, the difference between the recording of administrative procedures, such as the booking in *Gordon*, and of the interrogation here is a distinction without a difference. We agree with this assessment, notwithstanding that the recording here recorded more than mere appearances, e.g., "the defendant['s] bearing and manner of speaking," approved in *Gordon, supra* at 833, as relevant to the question of intoxication, and similarly relevant on the question of voluntariness. Indeed, the recording of this interview included the defendant's "thoughts or knowledge about some fact or subject." *Ibid.*

The defendant's contention places the technical application of the wiretapping statute in conflict with the policy behind the decision in *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 447-448 (2004), in which the court observed that the recording by at least audiotape of interrogations of defendants is a more reliable means of recording the defendant's words and appear-

---

[11]General Laws c. 272, § 99(B)(4), as appearing in St. 1968, c. 738, § 1, provides in pertinent part that the "term 'interception' means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." Section 99(C)(1), as appearing in St. 1968, c. 738, § 1, provides: "Except as otherwise specifically provided in this section any person who . . . willfully commits an interception, attempts to commit an interception, or procures any other person to commit an interception or to attempt to commit an interception of any wire or oral communication shall be [punished]."

[12]The motion judge noted that "the defendant manifested surprise upon learning the interview had been videotaped," and found that the defendant had "no awareness of that fact."

ance (than written summaries or reports, for example). Indeed, as a matter of superintendence, the court ordered that, henceforth, the failure of police to record an interrogation gives rise to the defendant's entitlement to a jury instruction that the statement should be viewed with "great caution and care" and permits the jury to conclude that voluntariness has not been adequately proven.[13] *Id.* at 448.

Significant to the issue whether the statute ought to apply in these circumstances is the observation by the court in *Gordon* that the wiretapping statute "can be read literally as making unlawful the audiotaping of booking procedures without the knowledge of the persons being booked, . . . [but] in the absence of more specific statutory language to that effect and in light of the preamble, we are unwilling to attribute that intention to the Legislature. It is apparent from the preamble that the legislative focus was on the protection of privacy rights and the deterrence of interference therewith by law enforcement officers' *surreptitious eavesdropping* as an investigative tool. . . . The Legislature does not appear to have had in mind the recording of purely administrative bookings steps following an individual's arrest." (Emphasis supplied.) *Gordon, supra* at 832-833.

"The statute delegates to the courts the task of striking the proper balance in each individual case." *Commonwealth* v. *Rivera*, 445 Mass. 119, 124 (2005), citing *Commonwealth* v.

---

[13]Deciding the precise issue presented here was unnecessary to the decision in *DiGiambattista*, but support may be inferred from reasons that the court rejected an outright exclusionary rule, largely because of unworkability: a "rule of exclusion would also have to allow for justifiable failures to record — e.g., . . . the suspect's refusal to allow recording (or insistence that the tape recorder be turned off at a particular point during the interrogation). See G. L. c. 272, § 99. With regard to a suspect who is willing to speak to the interrogator but initially unwilling to be recorded, would we need to impose some requirement that the interrogator make a good faith effort to convince the suspect to agree to recording, lest that ostensible 'justification' for not recording too easily become the exception that swallows the rule?" *DiGiambattista, supra* at 445. See *Commonwealth* v. *Tavares*, 81 Mass. App. Ct. 71, 73-74 (2011) (reversing for failure to instruct even though defendant refused consent to videotape). The court was "hesitant to formulate a rigid rule of exclusion, and all its corollary exceptions and modifications (each of which would potentially spark new disputes in motions to suppress)." *DiGiambattista, supra.* Given such a policy statement, the myriad of ways that a failure to record might be exploited provides additional reason why the wiretapping statute ought not to apply in these circumstances.

*Santoro*, 406 Mass. 421, 423 (1990) (recognizing that Massachusetts wiretap statute is "carefully nuanced" and strikes balance between *"legitimate privacy interests of individuals in speech they wish to keep private"* and need to equip law enforcement officials with means to combat increasingly sophisticated organized criminal activities [emphasis added]). See *Commonwealth* v. *Jackson*, 370 Mass. 502, 505 & n.4 (1976), *S.C.*, 391 Mass. 749 (1984) (G. L. c. 272, § 99, restrictions applicable only to "secret" interceptions without prior authority); *Commonwealth* v. *Morganti*, 455 Mass. 388, 401 (2009) ("Massachusetts wiretap statute prohibits wilful interception of oral communication, but 'interception' means to 'secretly record' ").

The recording of an interrogation is not "surreptitious eavesdropping," *Gordon, supra* at 833, such as when a defendant might be unaware that a conversation that he intended to keep private was being overheard by police; rather, here, the defendant was fully aware that he was engaged in an interrogation with police who repeatedly expressed their intention to get it "down on paper" and memorialize the interview.[14] Because it is obvious that, during this interrogation, the defendant did not intend to keep his statements private, recording of the interrogation does not amount to surreptitious eavesdropping; even if, as in *Gordon*, a literal application of the statute might imply a violation, we do not view the statute as intended to apply in such circumstances as these.[15]

E. *Trial issues.* The defendant contends that questions asked of him by the prosecutor during cross-examination improperly

---

[14]While the motion judge noted "that the defendant manifested surprise upon learning the interview had been videotaped," and found that the defendant had "no awareness of that fact," she concluded that the recording was not objectively secret as there was a sign on the interrogation room door, and on the table in the room, that indicated that the interrogation was being recorded, and there was a video camera visible in the room.

[15]We acknowledge that the circumstances of the recording in the present case are distinguishable from those in *Gordon*, in the respect that the recording here was plainly for investigative purposes rather than the ministerial or administrative purposes involved during booking. However, in our view the distinction is without a difference for purposes of the wiretapping statute; while the interrogation is for investigative purposes, the recording of it is not. That is, it is the interrogation and not the recording that is investigative; the purpose of recording the interrogation is not to gather evidence, but to record the evidence gathered by means of the interrogation.

introduced prejudicial bad act evidence. Specifically, the defend-
ant contends that the question posed by the prosecutor asking
whether he "respect[s]" the law, juxtaposed immediately before
the prosecutor's use of the defendant's prior convictions for
impeachment purposes, elevated this use of the convictions
beyond the limited purpose permitted, and suggested, to the
defendant's prejudice, that because he previously had been
convicted of crime, he was not law-abiding. The trial judge
ruled that the prosecutor's question was improper, and he
sustained the defendant's objection. See Mass. G. Evid. § 404
(2012). However, because this question ("You respect the law?")
immediately followed questions to the defendant about the duty
to tell the truth — asking him whether he "swore to tell the
truth," and if "the law requires [him] to tell the truth" — we
view the question as being more closely tied to the questions
that preceded it, which properly centered on the defendant's
credibility, rather than as an improper introduction to the defend-
ant's criminal violations which, as the defendant claims, alleg-
edly show instead a disrespect of the law. Trial counsel rejected
the idea of a contemporaneous limiting or curative instruction.
In his final instructions, the trial judge gave the jury a proper
and complete instruction as to the proper but limited considera-
tion of prior convictions, i.e., for credibility only; we assume
that the jury followed the instruction. See, e.g., *Commonwealth
v. Degro*, 432 Mass. 319, 328 (2000). Consequently, the defend-
ant has not shown that he was harmed.

Lastly, the defendant complains of improper statements made
by the prosecutor during closing argument, when he referred to
the defendant as "[a] man who when he was talking to the
police on video referred to 'those f'ing Guatemalans who all
look the same. You know how those f'ing Guatemalans get
when they're all together.' But then he dresses up in a nice suit
and comes on the stand and says, 'Three male individuals came
walking up the street.' "[16] Here, the Commonwealth presented
evidence that during the defendant's interview, he referred to

---

[16]We see no merit in the additional claim by the defendant that these state-
ments by the prosecutor somehow improperly commented on the defendant's
right to testify. In the context of the entire argument and the facts of the case,
we discern no error. While not "on all fours," *Commonwealth* v. *Gaudette*,
441 Mass. 762, 768 (2004), is analogous ("During cross-examination, the

the victim and his companions as "fucking three Guatemalans" and said that all Guatemalans look the same. The defendant takes issue with the racial tone of the remarks, contending that his statements during the interview show that he bore no personal animosity toward the victim or people of Guatemalan descent, but instead show that his use of the expletive was ubiquitous throughout the interview. That the defendant's descriptions may have been intended as race-neutral is one inference that may be drawn, but it is not the only one. While we agree that the defendant peppered his statements with a liberal use of the expletive, he did use it in reference to the appearance and the actions of the victim and his companions. In context, we agree with the prosecutor that these comments were relevant to show animosity toward the victim and his friends on account of their race. Consequently, these comments, taken directly from the defendant's own statements in evidence and against which no objection was made particular to race, were relevant to the motive and the state of mind of the defendant as well as to the credibility of his version of events as testified, in contrast to the portion of the defendant's statement that the jury were permitted to hear; we do not consider the remarks to be overly prejudicial in the circumstances. See *Commonwealth* v. *Bishop*, 461 Mass. 586, 596 (2012).

*Judgment affirmed.*

---

prosecutor questioned the defendant about statements he had made to the police shortly after the incident, drawing out the differences between those statements and the defendant's trial testimony . . . . This was a perfectly sound line of questioning, properly designed to undermine the defendant's credibility . . . . [T]he prosecutor had a specific evidentiary basis from which to argue to the jury that they could infer that the defendant had been able 'to shape' his testimony to conform it to the trial evidence").